James Dean WALKER, Petitioner,

v.

O. E. BISHOP, Superintendent of the
Arkansas State Penitentiary,
Respondent.

No. PB–67–C–42.

United States District Court
E. D. Arkansas,
Pine Bluff Division.

Sept. 28, 1967.

Gene Worsham, Fletcher Jackson and Dale Price, of Howell, Price & Worsham, Little Rock, Ark., for petitioner.

Robert D. Smith, III, and Don Langston, Asst. Attys. Gen. of Arkansas, Little Rock, Ark., for respondent.

## Memorandum Opinion

HENLEY, Chief Judge.

This is a habeas corpus proceeding brought by James Dean Walker, an inmate of the Arkansas State Penitentiary, pursuant to a judgment and commitment of the Circuit Court of Pulaski County following Walker's second conviction of the crime of first degree murder.

Petitioner was charged with willfully and maliciously killing Patrolman Jerrall Vaughan of the North Little Rock, Arkansas Police Department during the early morning hours of April 16, 1963, in the course of a gun battle involving Walker, his companion Russell Freeman Kumpe, Officer Vaughan, and Officer Gene Barentine of the North Little Rock Police Department.

Petitioner was tried first in May 1964 and found guilty and sentenced to death. He appealed to the Supreme Court of Arkansas which Court reversed the conviction on account of procedural errors committed in the course of the trial. Walker v. State, 239 Ark. 172, 388 S.W. 2d 13.

The second trial commenced on November 29, 1965, and continued for several days. Walker was represented by new counsel at that trial, which counsel are representing him in the instant proceeding. A vigorous defense was interposed with the theory being advanced that Officer Vaughan had been shot accidentally by Officer Barentine, a contention which does not seem to have been advanced at the first trial.[1] The defense also complained throughout the second trial that the State had suppressed evidence prior to and during the first trial.

The second jury, like the first, was convinced beyond a reasonable doubt that Walker was guilty; however, the second jury fixed his punishment at life imprisonment. There was a second appeal, and this time the conviction was affirmed; rehearing was denied but the Supreme Court granted leave to Walker to attack the judgment of the sentencing court collaterally on the basis of a specific contention that in connection with the second trial the State had suppressed the testimony of Mary Louise Roberts and Linda Ford, two prostitutes who had testified for the State in the course of the first trial. Walker v. State, 241 Ark. 300 and 663, 408 S.W.2d 905. The Supreme Court of the United States refused to review the action of the Arkansas Supreme Court.[2] Walker v.

---

1. It was essential to the State's case that the jury be convinced that Walker killed Vaughan; it was not sufficient for the State to show merely that Vaughan was killed in the course of a gun fight involving Walker.

2. Hereinafter the term "Supreme Court" refers to the Supreme Court of Arkansas.

Arkansas, 386 U.S. 682, 87 S.Ct. 1325, 18 L.Ed.2d 403, rehearing denied, 387 U.S. 926, 87 S.Ct. 2027, 18 L.Ed.2d 987.

Instant petition was filed in this Court initially on June 13, 1967, and was dismissed summarily for an apparent failure of petitioner to exhaust available State remedies. On August 8, 1967, on motion of petitioner and over the objection of respondent the case was conditionally reinstated on the docket; on August 16 the Court refused to dismiss the petition again and set the matter down for hearing on the merits on August 28. The hearing commenced immediately after noon on that date and was concluded about noon on August 30. The record is voluminous and includes transcripts of proceedings in the State courts and copies of briefs filed in both the Supreme Court of Arkansas and in the Supreme Court of the United States.

Petitioner contends that his second conviction was tainted with numerous alleged denials and deprivations of due process of law in violation of the 14th Amendment to the Constitution of the United States. He contends specifically that the trial judge was guilty of manifest prejudice against him; that pre-trial newspaper publicity rendered it impossible for him to have a fair trial in Pulaski County, and that the trial judge refused him a change of venue; that the State knowingly suppressed material defense evidence; and that the State knowingly used perjured testimony to procure the second conviction. Respondent, actually the State, denies that any of petitioner's contentions has merit.

██ Most of the contentions which petitioner advances here have been advanced already in the Supreme Court and rejected by that Court. It is well to point out before going further that this Court does not sit in this proceeding to review questions of State law upon which the Supreme Court has passed. The function of this Court is limited to a determination of whether petitioner

received the essentially fair trial guaranteed to him by the 14th Amendment. To the extent that the Supreme Court of Arkansas has ruled on federal constitutional questions presented by Walker, its rulings are entitled to respect, but on those questions this Court in the last analysis must exercise its own independent judgment. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770.

It is undisputed that about midnight on April 16, 1963, Walker and Kumpe in the company of two women, Linda Ford and Mary Louise Roberts, were patrons of a drinking establishment in downtown Little Rock. Both men were armed. Walker got into a fight with one Calvin Mattison and pistol whipped him severely; Kumpe aided Walker by drawing his own gun and preventing anyone from coming to the assistance of Mattison. Walker's pistol was accidently discharged, and the bullet struck and wounded another patron of the establishment.

Walker and Kumpe left the night club and repaired to their motel for the purpose of packing up and leaving town. They were traveling in an Oldsmobile sedan. Walker telephoned the Ford woman at her mother's apartment and instructed her to join the two men at the motel, and she did so. Whether Roberts accompanied Ford to the motel is disputed. It is clear that Roberts went to the motel in a cab driven by one Paul Alderman. She undertook to join the two men and the Ford woman but was ordered back into the cab. The two men and Linda Ford entered the Oldsmobile and Kumpe took the wheel; all three occupied the front seat with the woman in the middle.

The vehicle crossed the Arkansas River into North Little Rock and was driven through and beyond that City. The Alderman cab with Roberts in it followed the Oldsmobile, and the cab driver communicated with his despatcher by radio; the despatcher alerted the North Little Rock Police Department and Offi-

cers Barentine and Vaughan, operating separate police cars, undertook to give chase to the Oldsmobile and stop it. The Alderman cab had not been able to keep up with the Oldsmobile, and another cab, driven by Thomas G. Short, took up the chase but with the Alderman cab continuing to follow.

At a point some few miles East of North Little Rock on Arkansas State Highway No. 130 Barentine was able to bring the Oldsmobile to a halt; Officer Vaughan arrived on the scene almost immediately in his car. Barentine had caused Kumpe to get out of the Oldsmobile and come back to the Barentine car to be searched. At about this time the Short cab came upon the scene and stopped; a few seconds later the Alderman cab appeared.

Vaughan left his car, walked between the Barentine car and the Oldsmobile and approached the right front door of that vehicle. That door was opened either by Vaughan or Walker and firing broke out. At the commencement of the shooting Kumpe either ran from Barentine or threw himself to the ground; Barentine fired twice at Kumpe; he then fired four shots into the Oldsmobile; reloaded and fired a fifth isolated shot into that vehicle. Barentine used his radio to call for reinforcements which arrived almost immediately.

There is no question that both Barentine and Vaughan participated in the shooting. Walker was shot four or five times by Vaughan; Vaughan was struck in the chest by a single bullet and died in a very few minutes; he never made any statement as to who shot him.

It was the theory of the defense at the second trial that Vaughan was killed by a bullet fired from Barentine's gun which bullet had struck the Oldsmobile on the rear bumper and had, according to the defense, ricocheted striking Vaughan and inflicting a mortal wound.

At the second trial Walker took the stand in his own defense and denied that he had fired any shots; he also denied that he had more than one gun; it was the State's theory that he had two.[3]

The evidence produced at both trials was ample to justify the findings of both juries that Walker killed Vaughan willfully, maliciously, and with premeditation and deliberation, although the question of his guilt or innocence was for the jury, and the second jury might well have come to a different conclusion.

At the first trial Linda Ford testified positively that Walker killed Vaughan and the testimony of cab driver Short was to the same effect. Mary Louise Roberts testified at the first trial that she and Alderman drove up to the other vehicles before the shooting started; however, she stated that when the firing began, she threw herself down in the back seat of the cab and did not witness the details of the shooting.

The State issued subpoenas for both women prior to the second trial, but they were not served, and neither woman was present at the second trial. Over the objections of the defendant their prior testimony was read into the record. Short and Barentine testified at both trials. Alderman was not called as a witness at either trial.

Major Paul McDonald of the Arkansas State Police, a qualified ballistics expert, testified at both trials that the fatal bullet which had been removed from Vaughan's body was fired from a .38 caliber Smith & Wesson revolver having a four inch barrel which was found under Walker at the scene of the shooting. When Walker was first observed after the shooting he was holding a .38 caliber Smith & Wesson having a two inch barrel in his hand; that gun was kicked away from him by one of the investigating officers. In addition to

3. Walker did not testify at the first trial, and the Court gets the impression from reading the transcript of that trial that the principal defense relied upon was insanity; the fact of the killing of Vaughan by Walker seems not to have been denied seriously.

those guns, and in addition to Vaughan's gun, which was also a .38, still another weapon was found; that gun was a four inch barrel Colt .38 which was found under the front seat of the Oldsmobile; that gun was not fired during the melee, and it was readily ascertained that the bullet which killed Officer Vaughan did not come from that gun.

Major McDonald testified also at the second trial that ballistics tests showed that two of the bullets removed from Walker had been fired by Officer Vaughan, and it was conceded by the State at the second trial that Vaughan had wounded Walker.

■ With the foregoing by way of background, the Court now takes up the contentions of petitioner. In evaluating those contentions it should be said, first, that petitioner stands before this Court without the benefit of any presumptions in his favor. On the contrary, the burden in this proceeding is upon him to establish by a preponderance of the evidence at least that he was denied due process of law in one or more of the respects on which he relies.

It would prolong this opinion unduly to discuss in detail all of the numerous contentions urged by petitioner. The Court has considered all of them and finds ultimately that they are all without merit.

## I.

Not unnaturally the death of Officer Vaughan produced a good deal of publicity at the time in both Little Rock newspapers, to say nothing of the newspaper published in North Little Rock itself. Petitioner contends that articles appearing in both the Arkansas Gazette and the Arkansas Democrat together with an editorial appearing in the Gazette under date of May 12, 1965, were so inflammatory as to prejudice the minds of prospective Pulaski County jurors beyond remedy, and that it was a denial of due process to refuse to grant him a change of venue. Counsel cite

Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543; Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663, and Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, in support of this contention.

■ Any prejudice which the newspaper stories might have created in the minds of the jurors at the first trial was cured by the fact that the first judgment, which carried with it the death sentence, was reversed by the Supreme Court. And this Court is persuaded that the publications in question were too remote in point of time to have affected the second trial jurors. Further, the contents of the news stories involved in this case were not as inflammatory and prejudicial as those of the publications involved in some of the cited cases.

■ The editorial appeared between the two trials, but it preceded the second trial by more than six months. Moreover, while the editorial was evoked because of the reversal of Walker's first conviction, it was not directed particularly at Walker. Rather, it was directed at the alleged executive practice in Arkansas to commute sentences of life imprisonment so that persons receiving such sentences become in practice eligible for parole in about seven or eight years. If the editorial be construed as suggesting to prospective trial jurors that Walker be given a second death sentence rather than a sentence of life imprisonment, the answer is that the second jury did not act upon the suggestion.

The motion for a change of venue, based in part on the newspaper publicity, was heard on numerous affidavits and counter affidavits. The question was considered in detail by the Supreme Court in connection with the second appeal. This Court does not consider that on account of adverse publicity or on any other account due process required that the second trial be delayed longer than it was or that Walker be granted a change of venue.

## II.

Prior to the commencement of the second trial petitioner moved that the trial judge disqualify himself. A hearing on the motion was held, and the motion was denied. Petitioner now argues that the refusal of the trial judge to disqualify and certain allegedly prejudicial remarks of the judge during the course of the trial and in the presence of the jury constituted denials of due process.

The Court will assume for purposes of discussion and without deciding that the experienced Circuit Judge who presided at both trials was convinced at the commencement of the second trial that Walker was guilty and also convinced that he should again be sentenced to die. But, as pointed out by the Supreme Court, latent, subjective prejudice of that sort is not enough to require a judge to disqualify himself in a jury case.

In Arkansas in a criminal case tried to a jury the jury is the sole judge of the facts and of the credibility of witnesses and of the weight to be given to their testimony. The presiding judge has nothing to do with the facts and may not comment upon them or upon the sentence. In a capital case if the jury does not fix punishment at life imprisonment, the law, not the presiding judge, fixes the penalty of death. Here, the extreme penalty was not imposed as a result of the second trial.

It cannot be gainsaid that in the course of the trial the Circuit Judge made some comments in the presence of the jury which might be construed as manifesting irritation or impatience with defense counsel in their efforts to clear their client by creating in the minds of the jurors as many doubts as possible about Walker's guilt. This Court thinks it would have been better if at least some of the comments had not been made but does not think that the prejudice, if any, which may have resulted from the comments of the judge was sufficient to amount to a denial of due process of law.

Complaint is made that on two occasions during the second trial the trial judge referred to the fact that Walker had been convicted as a result of the first trial. Those references were made in connection with qualifying the second trial jurors, and appear to this Court to have been necessary if an impartial, unbiased jury was to be chosen. This particular complaint was dealt with adequately by the Supreme Court of Arkansas in its second opinion and is constitutionally insubstantial.

## III.

After petitioner employed his present attorneys, they filed a motion to compel the State to produce for examination and inspection certain ballistic materials and photographs. In connection with the motion counsel made it known that the defense had employed a ballistics expert who resided in Minneapolis, Minnesota, and that it was desired that this expert perform certain tests on the weapons and bullets involved in the case. The trial court granted the defense motion but over the objection of counsel stipulated that the Prosecuting Attorney was to be provided with a copy of the report of the defense expert. The Court's order, prepared by defense counsel and approved as to form by the Prosecuting Attorney, provided, among other things, that the report of the expert be filed with the Circuit Clerk as part of the record in the case.

The defense expert undertook ballistics tests with the two "Walker guns," the .38 Colt, Officer Vaughan's gun, and Officer Barentine's gun;[4] the expert was furnished also with the fatal bullet and with the bullets taken from Walker.

---

4. When the Barentine gun was delivered for test firing, counsel learned that Officer Barentine at some time after the first trial had caused his gun to be shortened by cutting two inches off of the barrel. That work was done by a gunsmith who was later able to find a piece of metal which he said had been cut from the Barentine gun. The shortened gun and that piece of metal were both submitted to the defense expert.

The expert did not prepare a "report" in the conventional sense of the term. He was asked certain written questions by defense counsel, and his "report" is actually a reproduction of the questions along with the expert's answers.

In the report the expert, Mr. Berg, stated that he agreed with Major McDonald that the bullets taken from Walker had been fired from the Vaughan gun; that he could not be sure whether the loose piece of metal furnished to him had been sawed from the Barentine gun; that the fact that the Barentine gun had been sawed off would render ballistics testing impossible in relation to a bullet fired prior to the shortening of the barrel; that the fatal bullet was in bad condition; that the condition of the bullet would make positive identification "difficult"; that notwithstanding the poor condition of the fatal bullet he did note a number of dissimilarities of individual characteristics of that bullet when compared with test bullets fired from the four inch barrel "Walker gun." [5]

Petitioner complains that when he was required to furnish the Prosecuting Attorney with a copy of the report, he was compelled to incriminate himself in violation of the 14th Amendment. Again the Court disagrees.

To start with, the Court does not consider it to be a violation of due process of law to require a defendant who obtains evidentiary material from the State and causes it to be tested scientifically to furnish the State with a copy of the report. The procedure followed in this case was not dissimilar to that which is now specifically authorized in federal court by Rule 16 of the Federal Rules of Criminal Procedure, as amended in 1966.

Moreover, the Court does not see anything particularly incriminating in the report. That counsel did not consider it incriminating at the time is indicated by the fact that they tried unsuccessfully at the second trial to introduce it as evidence of the facts set forth therein. The jury never saw or heard the report, and there is nothing in it which would have been of benefit to the State or prejudicial to the defendant.

It has been mentioned that the Barentine gun was sawed off prior to the second trial; while the Court is on that subject, it will go on to say that it rejects petitioner's contention that the action of Barentine in sawing off the gun amounted to a suppression of evidence. Barentine's action was explained satisfactorily to the second trial jury and to this Court. Furthermore, Major McDonald does not agree with Mr. Berg that the shortening of the weapon made it impossible to connect it with the fatal bullet.

IV.

What has just been said about the Barentine gun leads the Court into a discussion of the more general charges of petitioner that the State suppressed evidence and knowingly used perjured testimony.

There is no question that the Due Process Clause forbids a State knowingly to use perjured testimony to obtain a conviction in a criminal case, or knowingly to permit such testimony to stand uncorrected, or actively to suppress evidence favorable to the accused. Wilde v. Wyoming, 362 U.S. 607, 80 S. Ct. 900, 4 L.Ed.2d 985; Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L. Ed.2d 1217; Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9; White v.

---

5. No dissimilarities were noted in "class characteristics such as number of lands and grooves and their widths, direction of twist, etc." It is significant that Mr. Berg was not asked whether he observed any *similarities*, in individual characteristics. It may be observed additionally that Mr. Berg did not express an opinion either way as to whether the "Walker gun" fired the fatal bullet; for all that the report shows, Berg may have been of the opinion that the gun in question did fire the fatal bullet in spite of the dissimilarities to which he refers. Major McDonald apparently had no difficulty in establishing to his own satisfaction the source of the fatal bullet.

Ragen, 324 U.S. 760, 761, 65 S.Ct. 978, 89 L.Ed. 1348; Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214; Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791; Link v. United States, 8 Cir., 352 F.2d 207.

In order for a conviction to be voided on account of suppression of evidence, it need not appear that the Prosecuting Attorney was privy to the suppression; it is sufficient if the suppression is by investigating officers. Barbee v. Warden, 4 Cir., 331 F.2d 842; Curran v. Delaware, 3 Cir., 259 F.2d 707, discussing Pyle v. Kansas, supra. Nor need it appear that the suppression was *mala fide* or intentional; a negligent suppression may be sufficient. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215; Napue v. Illinois, supra; Ingram v. Peyton, 4 Cir., 367 F.2d 933; Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287; United States ex rel. Meers v. Wilkins, 2 Cir., 326 F.2d 135.

Not only is the State forbidden to suppress evidence favorable to the defendant; in some instances it may be required to disclose favorable defense evidence the existence of which evidence is not known to the defendant or his counsel. Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737; Brady v. Maryland, supra; United States ex rel. Meers v. Wilkins, supra; Ashley v. Texas, 5 Cir., 319 F.2d 80; United States ex rel. Thompson v. Dye, 3 Cir., 221 F.2d 763; United States ex rel. Almeida v. Baldi, 3 Cir., 195 F.2d 815, 33 A.L.R.2d 1407.

Much of petitioner's claim of suppression relates to photographs of the Oldsmobile automobile and of the ballistics material which would have revealed and ultimately did reveal that Officer Vaughan and not Barentine shot Walker. As far as that portion of the suppression claim is concerned it is sufficient to say, as the Supreme Court of Arkansas said, 241 Ark. at 306–307, 408 S.W.2d 905, that the suppression complained of took place in connection with the first trial; between the two trials petitioner's new counsel learned of the existence of the photographs and ballistics evidence and brought them to light.

Actually, this Court is not convinced that there was any suppression of evidence at the first trial. Although the State did not prove as part of its case that Vaughan had shot Walker, a fact known to the Prosecuting Attorney and to the police, it appears to this Court that petitioner's then counsel knew or was on notice that Vaughan had shot Walker and knew or should have known that ballistics evidence to prove that fact was available. In point of fact counsel in the first trial on more than one occasion came down to the verge of asking the simple question of whether Vaughan was doing any shooting, but the question was never asked. Major McDonald had testified that he had ballistics evidence other than the "Walker guns" and the Colt revolver; he was never asked what that other evidence was or what it showed. Neither Linda Ford nor Officer Barentine was asked about Vaughan's participating in the shooting. The photographs of the automobile were not really material until the later defense theory was advanced to the effect that Vaughan had been killed by a ricochet.

The Court will say that the physical evidence in the case was not handled in an efficient manner by the police, and that fact, plus the fact that the State did not develop all of the facts during the first trial, gave defense counsel ample room to argue in the course of the second trial that there was room for doubt as to whether the fatal shot had been fired by Walker. Those arguments were doubtless made and may well have had some effect on the jury when it came to the point of determining punishment.

It is contended that had Linda Ford and Mary Louise Roberts testified' at the second trial, their testimony would have been favorable to the de-

fense; that the State learned about the potential change in the testimony, and arranged by threats, or otherwise, that the two women not be available as witnesses at the second trial.

There is no evidence whatever before this Court that Linda Ford's testimony at the second trial would have been any different from her original testimony to the effect that she saw Walker shoot Vaughan or that any representative of the State ever had any reason to suppose that her testimony would be different.

Mary Louise Roberts testified at the hearing in this case to the effect that if she had been called as a witness at the second trial, she would have stated truthfully that she watched the entire shooting and never saw Walker do any shooting; that certain police officers knew that her second trial testimony would be favorable to the defense, and that she was made to understand that if she appeared and testified she would be subjected to repeated arrests.

Her testimony at the hearing to the effect that she saw the shooting and did not see Walker firing is not contrary to the theory of the State. The fact that Roberts did not "see" Walker firing does not mean that he was not doing so. To the extent that Roberts testified with respect to conversations with the police officers about the Walker case after the first trial and to the extent that she indicated in her testimony that the officers ordered her out of town or warned her to leave town, she is contradicted by the officers involved, and to the extent of the contradictions the Court rejects her testimony. The Court will observe that the Police Departments of both Little Rock and North Little Rock as a matter of policy discourage prostitutes from plying their trade in the respective cities, and some of the officers who testified in this case admitted that they

had told Roberts that she could not continue to live here and to operate as a prostitute without being arrested. However, there was no connection between those admonitions and the Walker case or her past or future testimony therein.

The Court finds affirmatively that the State had subpoenas issued for both women well in advance of the second trial, and that the State made good faith and reasonable efforts to locate both women. The Court further finds that the State had nothing to do with the fact that the women were not present at the second trial, and that they simply left the area for reasons of their own.[6]

It is contended that Mary Louise Roberts and Linda Ford both committed perjury in the course of the first trial, which alleged perjury was carried over into the second trial; that Officer Barentine committed perjury in both trials; and that the State was a party to the alleged perjury.

 This case involved the death of a police officer in line of duty; witnesses in the case included fellow officers of the deceased; two prostitutes and one cab driver. The fatal events occupied only a few seconds at most and took place during hours of darkness; all of the survivors were obviously frightened and excited. In such a situation serious credibility problems inevitably arise. Under our system of criminal law false or erroneous testimony should be discredited primarily at the trial stage by means of cross-examination or by the calling of more credible or more reliable witnesses.

 The two juries which tried Walker were certainly aware that they were faced with problems of credibility. Both juries were satisfied beyond a reasonable doubt from all of the evidence that petitioner was guilty of first degree murder. The ultimate judgment in the case is not lightly to be set aside in a

6. The record of the second trial suggests the possibility that between the two trials Linda Ford married and became pregnant. As far as the record shows, she

has not been observed by law enforcement officers in the Greater Little Rock area since the first trial.

collateral proceeding such as this by a mere reiteration of arguments already addressed unsuccessfully to the jury or by a mere assertion that the State's witnesses perjured themselves and that the State knew it. Cf. Kurth v. Bennett, 8 Cir., 274 F.2d 409.

Petitioner contends here, as he contended at the second trial, that in the course of the first trial the State deliberately created the false impression that Walker had killed Vaughan instantaneously, and that Vaughan had fired no shot—perhaps had not even had an opportunity to draw his own gun.

The first trial jury may or may not have gained that impression; if it did, the fault was probably as much that of the defense as it was of the State. But, the Court is not concerned with the impression created at the first trial, and it appears to the Court that a full disclosure of all facts was made at the second trial.

The second trial jury believed the State's witnesses and rejected the testimony of Walker. Whether this Court had it been a member of the second trial jury would have voted for conviction is beside the point. On the narrow issue before it the Court is not persuaded that the State's witnesses in the second trial willfully perjured themselves and that the State was an active or passive participant in the alleged perjury.

In the post-hearing brief filed on behalf of petitioner it is urged, among other things, that Barentine admitted in his testimony before this Court that he testified falsely in the Circuit Court trials when he said that his fifth and final shot was fired at Walker as Walker rose up in the front seat of the Oldsmobile. The Court does not construe Officer Barentine's testimony here as any admission that his previous testimony was false in the respect just mentioned or in any other respect.

It is earnestly contended in this proceeding that the cab driver Alderman was available to testify at both trials; that had he been called, he would have given testimony which, if credited, would have entitled Walker to an acquittal; that the State knew of this potential testimony and wrongfully failed to disclose its knowledge to the defense.

Shortly after the shooting Alderman left Little Rock and went to Lakeland, Florida, where he has resided ever since. He was flown into Little Rock by defense counsel and was called as a surprise witness when the hearing on the petition was resumed on the morning of August 29.

Alderman testified in substance that he witnessed the shooting; that he saw Vaughan shoot Walker; that when the firing commencer, Kumpe threw himself to the ground; that when the "flurry" or "flurries" of shooting died down Vaughan was on his feet, apparently unhurt; and that Walker was on the ground. Alderman proceeded to state that there was then a final shot which had a hollow, muffled sound as though fired from a can, and that Vaughan fell immediately after that shot.

Alderman then went on to say that he, rather than other officers on the scene, recovered the "Walker guns" and turned them over to the officers. He stated that he was interviewed by some unidentified officer or official and that a statement was taken from him the contents of which coincided with his testimony at the hearing.

Alderman stated further that after he went to Lakeland, he called an unidentified official or public employee, inquired whether he would be needed at the trial, and was told that he probably would not be needed but would be notified if the need for his testimony arose. He stated that he never heard anything further about the matter until he was located by defense counsel a short time before the hearing on the instant petition.

The contention based upon the Alderman testimony raises essentially the same question that was raised in United States ex rel. Meers v. Wilkins; Ashley v. Texas; United States ex rel.

Thompson v. Dye, and United States ex rel. Almeida v. Baldi, all supra.

In *Thompson*, supra, the Prosecuting Attorney knew that a particular police officer if called to the witness stand would give testimony favorable to the defendant. That officer was not called upon to testify nor was defense counsel advised that the officer was a possible source of favorable defense testimony. Another officer was called whose testimony was not favorable to the defendant. The Prosecuting Attorney then excused other officers, including the one whose testimony would have been helpful to the defendant, and suggested that the testimony of the other officers would simply corroborate that of the officer who did testify and would be cumulative. The defendant was convicted and sentenced to death. Subsequently, it was held in the cited case that the conduct of the Prosecuting Attorney was violative of due process.

*Thompson* was decided, of course, in the light of its own facts, including the fact that the Prosecuting Attorney stated or suggested falsely that the testimony of the officer in question would be essentially the same as those of his fellow officer. However, the concurring opinion of Judge Hastie, 221 F.2d at 769, gives broader consideration to the problem of the State's duty to make disclosure of the existence of evidence favorable to the defense. Judge Hastie said:

"The matter in controversy is the extent of the duty of public officers charged with the investigation and prosecution of crime when they discover conflicting evidence on a material point. The government and the court below seem to have believed that once the prosecutor, having examined all of the available evidence, is convinced that the truth of an issue lies on one side he is relieved of any obligation to disclose the existence of evidence which in some degree supports what he believes would be a false conclusion. However, it seems to me that it is not possible to lay down a rule of thumb for such situations. It can be said that the prosecutor must not act in an essentially unfair way. But this is an area in which the question of fundamental fairness depends so much upon the facts of the particular case that a precise rule cannot be devised.

"It seems likely that many situations will arise in which a prosecutor can fairly keep to himself his knowledge of available testimony which he views as mistaken or false. But there are other circumstances in which a prosecutor must, or certainly should know that even testimony which he honestly disbelieves is of a type or from a source which in all probability would make it very persuasive to a fair minded jury. This is notably true of testimony of a police officer, and most certainly of an arresting officer, favorable to a contention of the accused person. Here the prosecutor not only kept quiet about the existence of such testimony, but, as Judge McLaughlin points out, even stated in open court that other police officers if called 'would corroborate what already has been testified to.' Thus, the wrong of disclosure of obviously significant testimony was compounded by a misleading affirmative statement as to the nature of the available but unused testimony.

"In brief, it is not every case in which the prosecution must reveal the availability of testimony inconsistent with the government's contentions. But in special circumstances such nondisclosure may, and here it certainly does, amount to fundamental unfairness in the trial of a criminal case."

Judge Hastie's opinion was cited with approval by the Court of Appeals for the Fifth Circuit in Ashley v. Texas, supra, and by the Court of Appeals for the Second Circuit in United States ex rel. Meers v. Wilkins, supra. And this Court thinks that it lays down a sound general

principle; this Court's problem is to apply that principle here.

If Alderman in fact advised the officers or the Prosecuting Attorney that he had witnessed the shooting and had seen Vaughan on his feet apparently uninjured after Walker was lying wounded on the ground and had seen Vaughan fall after an isolated final shot having a peculiar sound and which might have come from under the car where, according to Alderman, Kumpe was hiding, or which might have come from Barentine's gun with the peculiar sound of the shot being due perhaps to a ricochet, then Alderman's testimony to such facts obviously would have been material to Walker's defense. It was not for the investigating officers or the Prosecuting Attorney to evaluate the truth of Alderman's story; that would have been the function of the trial jury. Regardless of whether the jury believed the story, Walker had a right to have it considered by the jury, and if the State suppressed the story, then Walker was denied due process of law.

The Court has given very careful consideration to Alderman's testimony both standing alone and taken in connection with the testimony of other witnesses. While the Court is not concerned with the truth of Alderman's version of the shooting in the same way that a jury would have been concerned with it, the Court is concerned with Alderman's credibility as a witness on the issue of suppression. The Court's problem is complicated to some extent by the fact that no written statement from Alderman has been found and by the further fact that certain investigative statements admittedly taken from other witnesses seem to be missing.

Alderman stated that while in military service he was attached for a time to a military police detachment; he says that he saw the shooting, and he seems to have taken a great deal of interest in what was going on. His memory with respect to the shooting proper including the fact that Vaughan was on his feet after Walker was on the ground and the fact that Vaughan fell after the single shot with the peculiar sound is or purports to be graphic; his purported memory is also graphic as to what he did after the shooting and before he left the scene. But, when his testimony came down to facts which would bear directly on whether his testimony at the trials was suppressed he became very hazy with respect to many details which the Court thinks that he would have remembered normally. He was not able to remember to whom he gave a statement, or where he gave it, or whether it was written or oral. He could not identify by name or title the person whom he purportedly called from Lakeland to advise that he was available as a witness. Further, to the extent that he purported to describe the shooting and the events immediately following it, his testimony is at variance with that of all of the other eye witnesses who testified in Circuit Court; his testimony is also contradicted in other respects by the testimony of other witnesses.

The Court thinks that in view of the fact that Alderman drove Roberts to the scene of the shooting and was admittedly on the scene for a time the officers or the Prosecuting Attorney or one of his deputies interviewed Alderman, and that Alderman told a story of some sort. But, that is as far as the Court can go. The Court does not know whether Alderman made a formal statement or to whom he made it, or whether it was written or oral or what was in it. Nor can the Court say that the telephone call which Alderman says that he made from Lakeland to Little Rock was made to any responsible person if, indeed, there was such a call.

■■ In order for the State to be guilty of suppression or non-disclosure of evidence it must appear that the evidence in question existed and that the State knew or was charged with knowledge of its existence. In the cases cited heretofore the existence of the evidence or potential evidence and the State's

knowledge of it were established. That is not the case here, and the Court is simply not convinced that the State was guilty of any suppression or non-disclosure as far as Alderman is concerned.

Petitioner complains that fingerprint evidence and results of paraffin tests were suppressed. Actually, he is complaining that fingerprint and paraffin tests were never made; what such tests would have proved had they been made, the Court does not know; the Court does not think due process required the making of the tests. Nor does the Court think that due process required ballistics tests of the Barentine gun as part of the initial pre-trial investigation after Major McDonald had already satisfied himself that the fatal bullet came from the four inch barrel "Walker gun."

A judgment dismissing the petition will be entered. If an appeal is desired, the Court will entertain an application for a certificate of probable cause.