**James Dean WALKER, Appellant,**

**v.**

**A.L. LOCKHART, Superintendent of the Arkansas Department of Corrections, Appellee.**

**No. 81–1700 (Habeas).**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 17, 1985.

Decided May 17, 1985.

Mandate Extended June 10, 1985.

Bill Bristow, Jonesboro, Ark., for appellant.

Theodore Holder, Asst. Atty. Gen., Little Rock, Ark., for appellee.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, and BOWMAN, Circuit Judges, En Banc.

BRIGHT, Circuit Judge.

In January 1984, this court, in a five to four decision, affirmed the district court's [1] denial of James Dean Walker's second petition for a writ of habeas corpus. *Walker v. Lockhart,* 726 F.2d 1238 (8th Cir.) (en banc), *petition for cert. dismissed by stipulation,* —— U.S. ——, 105 S.Ct. 17, 82 L.Ed.2d 912 (1984). Thereafter, new evidence surfaced relating to the crime for which Walker had been convicted. We recalled our mandate on June 13, 1984, and remanded the case to the district court with instructions to hold a hearing on the new evidence and to certify its findings to this court. *Id.* at 1265. Upon careful review of the new evidence and the district court's findings, we conclude that the ends of justice will be served by now directing the district court to grant the writ unless the State of Arkansas commences proceedings to retry Walker within ninety days from issuance of the mandate of this court.

## I. BACKGROUND.

The factual background and lengthy procedural history of this case are set forth in some detail by both the majority and the dissent in this court's recent en banc opinion. Briefly, on April 16, 1963, James Dean Walker and a companion, Russell Kumpe, were at a Little Rock nightclub with two women, Linda Ford and Mary Louise Roberts. Following an altercation in which another patron was shot, Walker, Kumpe, and Ford left the Little Rock area in Kumpe's Oldsmobile. Roberts, who was concerned about Ford, followed in a cab driven by Aaron Paul Alderman. Police Officer Gene Barentine pursued and stopped the Oldsmobile and parked his vehicle behind it. Officer Jerrell Vaughan arrived on the scene almost immediately thereafter, as did cabdriver Alderman and another cabdriver, Thomas Short.

Barentine ordered Kumpe out of the driver's side of the car and began to search him. Vaughan approached the Oldsmobile on the passenger's side of the car. At this point, the precise order of events becomes uncertain, but following an exchange of gunfire, Officer Vaughan lay dead or near death with a single bullet wound to his heart. Walker, who sustained five gunshot wounds, lay face down beside the Oldsmobile a few feet from Vaughan. In his right hand, Walker held a fully-loaded, undischarged gun. Kumpe, who tried to escape at some point during the confusion, had been shot twice by Barentine.

It is undisputed that the gun found in Walker's hand was not the murder weapon. Police found a second gun, a fully loaded Colt .38, under the front seat of the Oldsmobile. A third gun, found either underneath or near Walker's body, was later identified as the murder weapon.

The State charged Walker with first degree murder. At trial, the prosecution proceeded on the theory that Walker shot Vaughan with the gun that was found near his body, and that Barentine then shot Walker. Linda Ford and cabdriver Thomas Short offered evidence indicating that Walker shot at Vaughan. Ballistics evidence indicated that the bullet which killed Vaughan was fired from the gun found on the ground near Walker. The jury convicted Walker of first degree murder and sentenced him to death. The Arkansas Supreme Court reversed his conviction and remanded the case for a new trial. *Walker v. State,* 239 Ark. 172, 388 S.W.2d 13 (1965).

1. The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas.

Prior to Walker's second trial, defense counsel moved to disqualify the state trial judge on the ground that he was grossly prejudiced. The defense presented uncontradicted evidence that the judge, after granting Walker's request to go to church to be baptized, had instructed the deputy sheriff that if Walker "made a move to shoot him down, because he didn't want him brought back to him because he intended to burn the S.O.B. anyway." [R. II, 83.][2] The trial judge declined to recuse himself. During the retrial, he made a number of rulings and comments adverse to Walker.

Before the second trial, defense counsel obtained disclosure of ballistics evidence demonstrating that Vaughan, not Barentine, had shot Walker. Consequently, the State changed its theory at the second trial and contended that Walker fired first, and that Vaughan, although fatally wounded, managed to shoot Walker five times before he died. To support this theory, the State adduced essentially the same evidence as at the first trial. However, Linda Ford was not present at the second trial. The prosecution claimed that she was unavailable, and over defense counsel's objections, read her testimony from the prior trial into the record. The defense was thus unable to cross-examine Ford in light of the State's altered theory. The jury again convicted Walker of first degree murder, but sentenced him to life imprisonment. The Supreme Court of Arkansas affirmed the conviction. *Walker v. State,* 241 Ark. 300, 663, 408 S.W.2d 905 (1966), *cert. denied,* 386 U.S. 682, 87 S.Ct. 1325, 18 L.Ed.2d 403 (1967).

Walker then filed his first petition for habeas corpus relief alleging, *inter alia,* that the trial judge was biased and that the prosecution had suppressed testimony of cabdriver Aaron Paul Alderman which would have been highly favorable to Walker. At the habeas hearing, Alderman testified that Kumpe had scrambled underneath the Oldsmobile when the shooting started. [H. I, 142.] Alderman claimed that he saw Vaughan fire several shots at Walker [H. I, 155], and that Vaughan remained standing after Walker had fallen to the ground. [H. I, 142.] There was a momentary lull in the shooting, and then Alderman heard a final shot which had a hollow, muffled sound—as though it had been fired from a barrel or pipe. [H. I, 141.] Vaughan fell immediately after that shot. The police then told Kumpe to come out from under the car. [H. I, 142.] Alderman testified that he removed the fully-loaded gun from Walker's hand. As he walked away, he saw another gun near the rear end of the Oldsmobile where Kumpe had been during the exchange of gunfire. [H. I, 145.]

Alderman gave his statement to police immediately after the shooting. [H. I, 146.] Although he moved to Florida a month or two later, he claimed that he called the "criminal court office" or the prosecuting attorney's office before the first trial to advise of his location and availability as a witness. [H. I, 169–70.] However, he was never called as a witness or notified about Walker's trials.

The district court (Judge Henley) questioned Alderman's credibility on the issue of suppression because no written statement by Alderman had surfaced, he was unable to remember details about where and how he gave his statement,[3] and he could not identify the person he called to advise of his availability as a witness. *Walker v. Bishop,* 295 F.Supp. 767, 779 (W.D.Ark.1967). The habeas court noted, moreover, that Alderman's account of events varied from that of other witnesses.

2. References to the record of Walker's first trial will be designated throughout this opinion as R. I, ______; references to the record of his second trial as R. II, ______; references to Walker's first habeas corpus proceeding will be designated as H. I, ______; and references to the transcript of the October 1984 evidentiary hearing as T. ______.

3. The district court acknowledged, however, that other investigative statements taken from witnesses were missing, and that "Alderman told a story of some sort" to officials. *Walker v. Bishop,* 295 F.Supp. 767, 779 (W.D.Ark.1967).

*Id.* The district court denied the writ, concluding, *inter alia,* that it was not convinced that the State had suppressed Alderman's testimony, and that the prejudice of the trial judge was not sufficient to deny Walker due process. A panel of this court affirmed the judgment of the district court. *Walker v. Bishop,* 408 F.2d 1378 (8th Cir. 1969).

The present litigation originated in 1981 when Walker filed a second application for habeas relief. The district court (Judge Woods) ruled that four of the seven claims asserted by Walker in his second petition had previously been determined adversely to him in his original application for habeas relief. The court considered the guidelines for successive habeas petitions set forth in *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963),[4] and concluded that because the prior determinations were on the merits, no intervening change in the law had occurred, and Walker had presented no new evidence, the "ends of justice" would not be served by reconsideration of the same claims. *Walker v. Lockhart,* 514 F.Supp. 1347, 1350–51 (E.D.Ark.1981). The trial court permitted Walker to present evidence on his newly asserted claims, but found the additional grounds to be without merit[5] and denied the writ.

On appeal, following arguments before a panel of this court, the case was referred to the court en banc. The court requested additional briefing on several issues, including whether the constitutional violations alleged (prejudice of the trial judge, suppression of evidence, or other violations) had grossly flawed the guilt determination in this case. After an en banc hearing, this court affirmed the judgment of the district court, holding that Walker had failed to show that the ends of justice required reconsideration of issues determined adversely to him in his first habeas application.

The four dissenting judges concluded that a great injustice had been done, and that Walker was entitled to habeas relief. In particular, the dissent emphasized that the admitted prejudice of the trial judge had deprived Walker of a fair trial, that the prosecution had suppressed evidence favorable to Walker, and that "the record as a whole indicates the strong probability that Walker did not shoot Vaughan." 726 F.2d at 1252.[6]

Judge Arnold, although voting with the majority to deny the writ, agreed in a concurring opinion that Walker had been tried before a prejudiced trial judge. He pointed out that "[i]f due process means anything, it means a trial before an unbiased judge and jury." *Id.* at 1249. Judge Arnold further indicated that he disagreed with this court's 1969 decision denying Walker's first habeas petition. He noted, however, that mere disagreement is not enough to justify granting relief on a successive habeas application. Something more is required, such as a change in the law or "new evidence unrevealed at the time of the first habeas proceeding." *Id.* at 1250.

4. In *Sanders,* the Supreme Court established guidelines governing consideration of successive petitions for habeas corpus relief. When a successive application raises grounds previously heard and determined, a court need not reconsider those grounds if they were (1) "determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application." 373 U.S. at 15, 83 S.Ct. at 1077. When the successive application presents a different ground, or if the same ground was presented earlier but not adjudicated on the merits, "full consideration of the merits of the new application can be avoided only if there has been an abuse of the writ * * *." *Id.* at 17, 83 S.Ct. at 1078. See *Walker v. Lockhart,* 726 F.2d at 1241–43, for a more thorough discussion of the *Sanders* criteria.

5. On appeal, Walker did not seriously urge error with respect to the findings on these additional grounds, and, as this court noted, the trial court's determinations on the new claims were not clearly erroneous. 726 F.2d at 1249.

6. Judge Heaney served on the panel of this court which denied Walker relief in 1969. He joined the dissent on Walker's second petition, and joins with the majority in this opinion, underscoring his strong belief that the previous panel erred, and that only by granting Walker habeas relief can we right a grievous miscarriage of justice.

In sum, notwithstanding the denial of relief, a majority of the en banc court concluded that this court erred in 1969 when it denied Walker's application for habeas relief because Walker had not received a fair trial before an unbiased judge.

After issuance of our mandate denying the writ of habeas corpus, Walker, on March 15, 1984, filed a petition for recall of mandate on the ground that new evidence about the crime had surfaced. That evidence came in the form of a diary entry written in 1968 by Russell Kumpe, Walker's companion on the night Officer Vaughan was killed. The entry indicated that Kumpe fired a gun at or near the time Vaughan was shot. In addition, Walker's counsel offered to prove that Kumpe admitted to his former wife that he, not Walker, shot the officer. In response, the State indicated that it possessed a tape-recorded statement, which it had never offered into evidence, in which Walker allegedly confessed to the crime.

We granted the motion for recall of mandate by a divided vote. The order recited in part:

> The case is remanded to the district court with instructions to take evidence from Russell Kumpe and his former wife, Peggy Davidson, relating to Kumpe's alleged firing of a gun at or near the time that Officer Vaughan was shot on the night of April 15–16, 1963. That evidence is to include the diary entry apparently dated January 16, 1968, relating to that incident.
>
> On remand, the State may offer as evidence the recorded confession of Walker allegedly made after his first trial. Walker may offer evidence to explain that alleged confession.
>
> The remand proceedings may be limited to the receipt of the evidence mentioned by both sides in their papers with respect to the recall of mandate, including the Kumpe statements and the recorded confession of petitioner and any explanation thereof and such additional evidence as the district court in its discretion may deem relevant to these proceedings.
>
> The district court should determine whether any of this evidence is credible enough to deserve the attention of a jury; whether the evidence would be admissible if a new jury trial were held; and whether the new evidence, when considered against the background of the existing record, sufficiently tips the balance of the "ends of justice" standard to require that a new trial be held. These findings should then be certified to this Court, sitting en banc, which can then consider, after briefing and oral argument, whether the new evidence, in the light of the district court's findings, requires a new trial.

726 F.2d at 1265.

Judge Arnold, in a separate concurrence to the order recalling the mandate, observed that if the new evidence could establish that Kumpe had in fact fired his gun on the night in question, such evidence would give credibility to Alderman's account of the shooting, which exonerates Walker and which has never been heard by a jury. 726 F.2d at 1266. Judge Arnold concluded that the new material "sufficiently adds to the uncertainties of this case to justify additional proceedings." *Id.* at 1267.

Pursuant to our instructions, the district court held an evidentiary hearing in October 1984. The court heard testimony from some thirty witnesses, and considered the evidence specifically mentioned in our remand order, as well as additional evidence which surfaced after the recall of mandate. The district court concluded that the record contained no credible evidence which merited a new trial; that only part of the new evidence would be admissible if another jury trial were held; that Walker's right to due process had not been violated by the suppression of exculpatory material; and that the new evidence did not sufficiently tip the balance of the "ends of justice" standard to require that a new trial be held. *Walker v. Lockhart,* 598 F.Supp. 1410 (E.D.Ark.1984).

This matter is now before us for further review in light of the evidence presented and the district court's findings.

## II. DISCUSSION.

The question before this court is whether the new evidence sufficiently tips the balance of the ends of justice standard to permit us to reconsider the merits of the claims raised in Walker's first habeas petition. We must assess, among other things, the admissibility and credibility of the evidence presented, but as to credibility, the issue is not whether the district court or this court would find the new evidence credible, but whether the evidence possesses sufficient credibility that it should be heard by the real factfinder: the jury.[7]

### A. Evidence Considered Under The Ends of Justice Standard.

#### 1. Kumpe's Testimony.

Russell Kumpe, who did not testify at any of the prior proceedings in this case,[8] appeared at the evidentiary hearing as a witness for both the petitioner and the State. Kumpe, while blaming Walker for Vaughan's death, offered a version of events inconsistent with the State's theory at the second trial that Walker fired first and Vaughan, although fatally wounded, returned the fire. Kumpe repeatedly asserted that Vaughan, not Walker, fired first. According to Kumpe, Officer Barentine ordered him to get out of the Oldsmobile, and then told him to "spread eagle the police car," which was parked directly behind Kumpe's vehicle. [T. 105.] Kumpe leaned over the left front fender with both arms spread out and his stomach pressed up against the police car. [T. 20.] From that position, he looked "down toward the Oldsmobile." [T. 106.]

> And while I was looking down Walker cracked the door and when he did the dome light came on and I could see that he had a pistol in his hand. And about this same time Vaughan came up and he parked directly behind Barentine but slightly to the right so the two police cars were behind one another.

[T. 106.] Barentine was searching Kumpe as Vaughan approached the Oldsmobile. Kumpe warned Vaughan that Walker had a gun, and Vaughan responded "that he had a gun and he'd get the S.O.B. And as he approached the car, the door—the door came open and Vaughan shot Jim and Jim returned the fire and shot and killed Vaughan." [T. 107.] Vaughan fired first; the first two flashes came from his gun, and

7. The dissent suggests that the court has ignored the district court's finding that the newly discovered evidence is not sufficiently credible to deserve the attention of a jury. *Post,* at 964. Although we directed the district court to make that determination in our remand order, the district judge seems instead to have made his own assessment of the credibility of the evidence. *See* 598 F.Supp. at 1430. However, to the extent that the district court did make a factual determination on the lower threshold question of whether the evidence was at least sufficiently credible to be heard by a jury, we believe that the court's determination that the evidence did not meet that minimal level of credibility is not plausible in light of the record viewed in its entirety, and is therefore clearly erroneous. *See Anderson v. City of Bessemer City,* — U.S. —, —, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The dissent further asserts, relying on *Jones v. United States,* 279 F.2d 433 (4th Cir.1960), that, in assessing whether newly discovered evidence is sufficiently credible to be heard by a jury, we have drawn an unwarranted distinction between the *Sanders* ends of justice standard and Rule 33 motions for new trial. *Post,* at 965 n. 4. *Jones,* however, was not a habeas case and did not involve a successive petition. Moreover, it was decided three years before the Supreme Court formulated the ends of justice standard in *Sanders.* In *Jones,* the court was faced with a motion for a new trial. In addition, the trial judge in *Jones* had heard all of the evidence, unlike the present case in which Judge Woods, who was not the trial judge or the district court judge in the first habeas proceeding, has not heard all of the evidence. Thus, contrary to the dissent's assertion, *Jones* is neither persuasive nor illustrative.

8. At the hearing, Kumpe stated that when the prosecutor asked him about testifying at Walker's trials, he indicated his unwillingness to do so. "[The prosecutor] told me that he was going to subpoena me and put me on the stand and if I lied he'd charge me with perjury. And I distinctly remember telling [him] that I was aware he could put me in jail for lying but he couldn't do anything to me for having a bad memory and I had no intention of testifying." [T. 94.]

the next flash came "[f]rom the car from where Walker was." [T. 107.] Kumpe did not actually see Walker's hand when he fired the shot; he saw only the flash of the gun. [T. 55.] Kumpe swung off the police car and "took off." Barentine, who by that time had unholstered his gun, shot Kumpe twice. Kumpe ran around the police car, then looked back and saw Barentine standing near the front of the police car firing down toward Walker and the Oldsmobile. [T. 108.]

Kumpe's testimony that Vaughan fired first, if believed, undermines not only the State's theory about Vaughan's death, but the credibility of Linda Ford's testimony that Walker initiated the shooting, and that testimony was crucial to the conviction of Walker.[9]

After the shooting, police found three weapons at the scene: a fully-loaded Colt .38 revolver found under the front seat of the Oldsmobile; a fully-loaded .38 caliber Smith & Wesson with a two-inch barrel found in Walker's right hand,[10] and the weapon which caused Vaughan's death, a .38 caliber Smith & Wesson with a four-inch barrel, variously described as having been found underneath Walker's body [H. I, 272], near the rear end of the Oldsmobile [H. I, 145], under the right rear wheel of the Oldsmobile [H. I, 366], and underneath the passenger's side of the car.[11] [T. 595.] Kumpe has now admitted ownership of the murder weapon. [T. 21–22.] He also admitted that he had that weapon and the Colt .38 in his possession on the night in question. [T. 21–24, 112.] Kumpe claimed that he left both weapons in the Oldsmobile.[12] [T. 22.] Yet, several witnesses testified at the hearing that Kumpe told them he was armed when he got out of the car.[13] [T. 174–75, 207, 240, 278.] Although Kumpe denied making any such statements, a jury could reasonably infer from the testimony of these witnesses and other new evidence adduced at the hearing that the gun that killed Vaughan was in Kumpe's—not Walker's—possession at the time of the shooting.

**2. Kumpe's Diary Entry.**

In November 1983, while cleaning out a closet, Russell Kumpe's former wife, Peggy Davidson, found a box containing some of Kumpe's belongings. Included among the belongings was a diary written by Kumpe in 1968 while he and Walker were inmates in the Arkansas Penitentiary. The diary entry for January 16, 1968, reads in pertinent part as follows:

> Awakened at 1:30 A.M. by nite sheriff—Told only to go to Mr. O's office—Emergency. A great deal of agitating being done by James Dean Walker. *I look at him and feel much remorse that I fired too high on 4-16-63.* He, according to rumor has vowed that he will kill me at first opportunity. I do not underestimate his potential, but am not alarmed.

[Pl.Exh. 1] (emphasis added).

The authenticity of the diary stands unquestioned. At the hearing, Kumpe identi-

9. It is worth noting that cabdriver Thomas Short did not actually see Walker fire. [H. I, 300.] In addition, Barentine testified at the 1984 hearing that he did not see Walker fire a shot. [T. 587.]

10. No witness has testified to seeing Walker with more than one gun at the time of the shooting.

11. Importantly, at the October 1984 hearing, Officer Barentine authenticated a police report he filed on April 16, 1963, which stated: "We removed the gun from [Walker's] hand then found another gun underneath the passenger's side of the car on the ground." [T. 594–95.]

12. Kumpe testified that when he and Walker left the Little Rock area, he put one of the guns in his waistband and the other on the front seat of his car. He further testified that, before he got out of the car, he placed the gun that had been in his waistband under the driver's seat.

13. According to the witnesses, Kumpe said that the gun was in his waistband, but Barentine missed it when he frisked Kumpe because Kumpe pressed himself hard against the police car, and Barentine had not completed the search when the shooting began. To refute the witnesses' testimony, Kumpe claimed that Barentine's search had been thorough enough not to have missed a gun in Kumpe's waistband. [T. 132–33.] Barentine testified, however, that he had not completed his search when the shooting began [T. 587], and that he shot Kumpe because he did not know whether or not he was armed. [T. 602.]

fied the handwriting as his [T. 36], and acknowledged that he kept the diary for over a year. [T. 139–40.] Although Kumpe did not deny making the entry in question [T. 39], he explained that he made a mistake when he wrote "*I* fired too high," because he meant to write "*he* fired too high" (referring to Officer Barentine).[14] [T. 41.] Kumpe offered several reasons for his alleged mistake,[15] but ultimately denied that

> any particular thing caused me to write "I" instead of "he" * * * I think it was the fact that probably that I was writing along and using the pronoun, personal pronoun "I, I, I" and when I got to that point—I'm guessing now because I was only—I wrote "I" instead of "he" * * * And I can't give you a better answer than that.

[T. 138.]

The district court characterized Kumpe's explanation that he substituted "I" for "he" as "somewhat dubious." *Walker v. Lockhart,* 598 F.Supp. at 1428. Whether a jury would credit his explanation remains to be seen.[16] What is clear, however, is that the diary provides admissible evidence that Kumpe said he fired a shot on the night in question. *See id.*

### 3. Kumpe's Statements to His Former Wife.

Peggy Davidson, who was married to Kumpe from 1968 to 1975, testified that Kumpe told her on two or three occasions that he was armed at the time of the shooting. [T. 180.] On one of those occasions, in the presence of Davidson and two other people, Kumpe stated that he had a gun in his pants when he got out of the car which Barentine missed during the search, and that he, Kumpe, fell down under the Oldsmobile after the shooting started. [T. 175, 178.] During that conversation, Kumpe did not say whether he had fired any shots. [T. 177–78.] Afterwards, however, when they were alone, Davidson recounted that she said to Kumpe: " 'Russell, you shouldn't tell that. The way you tell that,' I said, 'it sounds like you did it.' And he kind of grinned and he said, 'I did.' "[17] [T. 178.] According to Davidson, Kumpe told her on another occasion that "he only made one mistake. He didn't kill James Dean Walker too." [T. 179.]

The district court found that Peggy Davidson's testimony should be viewed with skepticism because of her apparent animosity toward Kumpe and her sympathy for Walker. 598 F.Supp. at 1428. Yet this important testimony, supported by Kumpe's diary entry, is certainly credible enough to deserve the attention of a jury.

It may be that Kumpe's diary and his statements to Davidson and others, as hearsay, would not be admissible as substantive evidence at a new trial. Nevertheless, such evidence could at least come before the jury for purposes of impeachment. It is reasonable to assume that if the State retries Walker, Kumpe would again be called as a witness, and that he would be available to testify.[18] Having

14. Although the entry contains no other reference to Barentine, Kumpe offered the following explanation for his contention: "Well, Mr. Barentine was firing rather wildly and he certainly was shooting over Mr. Walker if Mr. Walker is in the position where he was, and he's shooting through the Oldsmobile so certainly he's firing too high." [T. 54.]

15. Kumpe variously suggested that the mistake was the result of writing the diary with his hand inside a desk drawer [T. 40], writing the entry hurriedly and in poor lighting [T. 124], and writing the entry after a brief encounter with Walker that left him agitated. [T. 136–37.]

16. A jury might deem it significant that Kumpe chose the word "remorse" to describe his feelings about firing too high. "Remorse" usually reflects the feeling a person has about his *own* acts or omissions, not the acts of others.

17. Kumpe denied making this response and asserted that he had once responded to a question from Davidson about the possibility that Walker might be innocent by saying, " 'Well, Christ, Baby, there were only three people out there. If [Walker] didn't do it and the policemen didn't do it,' I said, 'that only leaves me.' " [T. 87.]

18. Kumpe is presently an inmate in the Arkansas prison system. If, however, Kumpe is unavailable for some reason at the time of a new trial, the diary and his alleged statements might be admitted under the hearsay exception for

testified fully at the October 1984 hearing, Kumpe has waived his right to claim the privilege against self-incrimination. Nor could he now claim (as he did to avoid testifying at Walker's first two trials) that he has no memory of the events in question. Presumably the State, having characterized his testimony as "critical" [Appellee's Brief at 4], would call Kumpe to give his account of the events surrounding Vaughan's death. On cross-examination, the defense could ask Kumpe whether he fired a gun that night. If Kumpe's answer is no, he could then be asked about the diary entry, and about other newly discovered evidence indicating that he fired a weapon that night. If Kumpe admits the diary entry and other statements now attributed to him, then, as Judge Arnold explained in voting to recall the mandate,

> the fact of these prior inconsistent statements would then be before the jury, together with whatever explanation Kumpe might wish to offer. If, on the other hand, he denies making the alleged prior inconsistent statements, extrinsic evidence of these statements, including the diary itself and the testimony of Kumpe's former wife, could be offered for impeachment purposes. See Jones, Case Note, Roberts v. State: *A Limitation on the Impeachment of Witnesses by Extrinsic Evidence of Prior Inconsistent Statements,* 37 Ark.L.Rev. 688 (1984). In either event, the jury would know about the diary entry and the alleged oral admissions. It would have an opportunity to observe Kumpe in person and to assess his credibility in light of all the circumstances, including the prior inconsistent statements. Ordinarily, newly discovered evidence is not sufficient to justify new proceedings if it goes only to the credibility of a witness, but this case is so evenly balanced that this sort of impeachment of Kumpe's credibility could well be decisive in the mind of the jury.

726 F.2d at 1266.

Even if the State does not call Kumpe as a witness, the defense may do so. The State argues, citing *Allen v. State,* 281 Ark. 1, 660 S.W.2d 922, 924 (1983), that Arkansas law does not permit a party to call a witness merely to lay a foundation for a prior inconsistent statement. However, in the present case, the defense would undoubtedly wish to call Kumpe not merely for impeachment purposes, but for the substantive purposes of establishing that Vaughan fired first and that Kumpe owned the murder weapon and had it in his possession on April 16, 1963. On cross-examination, Kumpe would very probably offer his account of the shooting. The defense would then, on redirect, have an opportunity to impeach Kumpe with his prior inconsistent statements.[19]

### 4. Walker's Alleged Confession.

#### a. The Walker-Karam Tape.

In May 1964, shortly after he was convicted and sentenced to death at his first trial, Walker agreed to make a tape-recorded statement for Jimmy Karam, a member of the Gideons. While in jail, Walker had undergone a religious conversion and had been baptized. Karam wanted to obtain Walker's personal testimony for use by Billy Graham and by the Gideons at church meetings and revivals "to help young people not to fall by the wayside" as Walker had done. [T. 558.] The tape, which was

declarations against penal interest. Ark.Stat. Ann. § 28-1001, Rule 804(b)(3) (Repl.1979).

19. Under Arkansas law, a party may impeach his own witness by use of a prior inconsistent hearsay statement. *Roberts v. State,* 278 Ark. 550, 648 S.W.2d 44, 45 (1983). However, the probative value on the issue of impeachment must outweigh "the prejudicial effect arising from the danger that the jury will give substantive effect to the prior inconsistent statement." *Id.* In *Roberts,* the Arkansas Supreme Court ruled that the impeachment should not have been allowed because the danger was too great that the defendant would be convicted on the basis of unsworn testimony. No such danger exists with respect to the impeachment evidence in question here. Rather, the evidence would go to impeaching the credibility of a witness who has claimed to be "the only person that actually knew what happened out there that night." [T. 46.]

intended to show Walker's conversion and repentance, was recorded by a state police officer at the Pulaski County Jail. The original tape has apparently been in the possession of the Arkansas State Police since May 1964. [T. 525.] In the course of his testimony as a born-again Christian, Walker says, among other things:

> And I come to Little Rock, Arkansas, and again, I was drinking and that led to a fight up here in a nightclub. Now it's led to murder. I killed a man out here, plus ... it's probably late now to say that it wasn't done intentionally, but it wasn't. * * * One day we were having a prayer, and I asked the Lord to forgive me if he could for my sins that I committed because I had committed I can say, ah, every sin imaginable ... stealing up to adultery, fornication ... murder even.
>
> * * * * * *
>
> Yes, I know it's hard on you to take a life ... Her [Mrs. Vaughan's] husband's dead and that in some way, I don't know how, I would like to tell her that ... I know "I'm sorry" doesn't say very much, but ... that's how ... it's a terrible thing to have happen."

[Def.Exh. B.]

Although the taped statement was available to the State at the time of Walker's second trial, the State did not attempt to offer it into evidence. Thus, while the tape is new to us, it is not new to the parties, nor is it newly discovered evidence in the same sense as Kumpe's statements. Nevertheless, on remand we authorized the State to offer the alleged confession into evidence.

At the hearing, Walker did not deny having made the statements quoted above. He explained, however, that the statement he recorded for Karam "was never meant to be any kind of a confession to murder * * * [o]r to shooting Officer Vaughan." [T. 657.] Rather, Walker intended only to indicate his acceptance of moral—as distinguished from legal—responsibility for Vaughan's death [T. 650], a responsibility which he accepts to this day.[20] [T. 642.] He explained that, regardless of what actually happened at the scene, he was morally responsible for the whole chain of events leading up to a man's death, and his acceptance of that responsibility, as reflected in his statement, was part of his acceptance of Christian teaching.[21] [T. 641–42.] With respect to the tone of the tape and his mode of expression, Walker recounted that, just prior to the taping, Karam encouraged him to make the testimony as powerful as possible so that it would have the greatest impact on young people. [T. 649.] In fact, during the taping, Karam encouraged Walker to elaborate more and " '[b]eef it up' a little bit, so to speak." [T. 654.]

Walker further explained that, from the time he woke up in the hospital to the time of his first trial, he did not know whether or not he was directly responsible for Vaughan's death. As soon as he regained consciousness, he was told that he had killed a policeman. [T. 630–31.] He remembered being

> thoroughly confused. I began to search my mind on the events that had happened and I knew that I could not remember firing a shot, and I kept searching my mind as to the possibility that maybe in the process of being shot, maybe I could have fired a round reflexively. But I, I could not recall firing, no.

**20.** Walker denies that either he or the Gideons for whom he made the tape intended his "Christian testimony" to be a confession of legal guilt. Near the beginning of the tape, Karam states that Walker is there to "take" the jury's verdict of murder in the first degree. Yet the Gideons were not suggesting that Walker should accept the verdict as a legal matter. In fact, the Gideons not only encouraged Walker to appeal, they retained counsel for the purpose of challenging the legal verdict. [T. 558, 657, 695.]

**21.** Walker also explained that, while he has never denied moral responsibility for Vaughan being killed, "[t]here's a great difference between someone being murdered and someone getting killed, and Officer Vaughan got killed that night somehow, and I simply don't know how." [T. 664.]

[T. 631.] During the months before his first trial, Walker considered the possibility that, as he was being shot, he might have squeezed the trigger as a reflex action. [T. 675.] But at his first trial, when Walker learned for the first time that the gun removed from his right hand was fully-loaded, he knew (he says) that he could not have shot Vaughan because he only had one gun.[22] [T. 693.]

The district court found that Walker's explanation for his apparent admission "did not ring true." 598 F.Supp. at 1429. Yet a jury might accept Walker's explanation for his statement to Karam. A jury would, moreover, view all of Walker's statements in the context of the record as a whole, including Alderman's testimony and some of the newly discovered evidence which suggest that someone else may have fired the bullet that killed Vaughan.

The district court, after hearing the evidence on remand, attached particular significance to the idea that Walker could have shot Vaughan reflexively. The court noted that if Vaughan opened fire, it is "logical that Walker would return the fire either deliberately or by reflex action after Vaughan shot him." *Id.* at 1429–30. The trial judge's statement carries with it the implication that if Walker fired a gun at all, he may have done so unintentionally, in which case the crime committed did not amount to first degree murder. The trial judge's suggestion is thus completely at odds with the theories advanced by the State at either of Walker's trials. *See ante*, at 945–946.

**b. The Carnahan Testimony.**

Ray Carnahan testified that in 1973, when he served as a Highway Patrolman, he and his immediate superior, Bill Skipper, drove Walker from an Arkansas prison facility to a Little Rock church for a speaking engagement. According to Carnahan, Walker stated on the way there that "he had gotten into the wrong crowd as a young man and that one thing led to another and the night that the officer was killed that he didn't want to go to jail and he shot the officer." [T. 152.]

Walker denied ever telling anybody that he shot Officer Vaughan. [T. 664, 674.] Bill Skipper, who was driving the car and who sat next to Carnahan, remembered that a conversation took place during the drive, but did not remember that Walker said he shot anyone. [T. 160–62.] The credibility of Carnahan's story again would be a matter for the jury.

After carefully reviewing all of the evidence presented at the hearing, we conclude that a significant portion of that evidence bears on the question of Walker's guilt or innocence, that it would be admissible if a new trial were held, and that it is credible enough to be heard by a jury.[23] Although not all the evidence produced in response to our order of remand is favorable to Walker, when considered against the backdrop of the existing record, the evidence creates sufficient additional doubt about Walker's guilt to tip the balance of the ends of justice standard and permit reconsideration of claims previously determined by a panel of this court.[24] Of partic-

22. During the remand hearing, Judge Woods ascertained that Walker remembered getting out of the car with a gun in his hand. The judge then asked: "Do you think that maybe as a result of getting shot that by reflex action, it's possible that you could have shot Officer Vaughan?" Walker responded, "I have thought that that could have been possible, Your Honor." [T. 666.] When asked later if he had not essentially admitted the possibility that he may have shot Vaughan, Walker explained that his answer to the judge's question was intended only to reflect the beliefs he held prior to his first trial. [T. 675–76, 684–85, 689–90.]

23. It is worth recalling that two of the witnesses to the events in question, Kumpe and Alderman, have never been heard by a jury.

24. The dissent states that the court has ignored the district court's finding that the newly discovered evidence does not sufficiently tip the balance of the ends of justice standard to permit further consideration of Walker's claims. Whether the ends of justice standard has been satisfied is a mixed question of fact and law, and it is within the discretion of the district court to make that determination. For the reasons discussed in the text, we hold that the district court abused its discretion in concluding that the ends of justice standard has not been

ular importance is Kumpe's admission that he owned the gun identified as the murder weapon, and the evidence that Kumpe fired a gun on the night in question, as indicated by the testimony of his former wife, and his own diary entry of January 16, 1968.

Because Walker has established that the newly discovered evidence justifies reconsideration of his claims, he is entitled to habeas relief. In our recent en banc opinion, both the majority and the dissent thoroughly considered the merits of Walker's claim that the bias of the trial judge deprived him of a fair trial. Five of the judges of the en banc court agreed that Walker had been tried before a biased judge and had, therefore, been deprived of his right to due process. *See In Re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). Four of the judges (Lay, Heaney, Bright, and McMillian) voted to grant habeas relief. The fifth judge, Judge Arnold, voted with the majority to deny relief because the ends of justice standard had not been satisfied. Upon the additional record, a majority of the en banc court is now satisfied that we may review Walker's claims, and that the merits require reversal of the denial of Walker's successive petition for habeas corpus relief.

### B. Suppressed Evidence: The Kumpe-Eisner Transcript.

Less than a week before the October 1984 hearing began, the State turned over to Walker's counsel a most extraordinary and revealing piece of evidence: a transcript of a surreptitiously recorded conversation between Russell Kumpe and his sister, Mildred Eisner (now deceased). The conversation occurred during one of Ms. Eisner's visits with her brother at the Arkansas Penitentiary. The eleven-page transcript of the conversation [25] dated November 12, 1963, includes the following statement by Kumpe:

> Now look, I am going to explain something to you. You understand that I did shoot at that policeman and he will go crazy trying to figure out what happened to the gun. If they place the gun in my hand naturally they could, no, they couldn't either cause [sic] I had been back in his custody, I don't know what they could have done and at the time I didn't care fro [sic] everybody was shooting at everybody else and I had some things on me that would have got me a hundred years. I had to get rid of them.

[Pl.Exh. 2.]

Walker contends that the Kumpe-Eisner transcript contains exculpatory evidence, that it has been in the State's possession for over twenty years, and that the State's failure to disclose it—despite sweeping discovery requests and a 1967 court order directing the State to turn over all material held on James Dean Walker—creates an independent basis for granting habeas relief. We agree. Although the transcript is relevant to the "ends of justice" analysis, the State's suppression of this exculpatory material constitutes a separate and independent ground for relief which we now review for the first time.[26]

satisfied in the circumstances of this case. Our holding is particularly appropriate in light of two factors. First, much of the existing record in this case—all of which must be weighed in the balance under the ends of justice standard—was not made before Judge Woods, and has been thoroughly and independently reviewed by this court. Second, Judge Woods' suggested theory of the crime (*see ante,* at 954) contradicts the State's trial theory that Walker intentionally fired the first shot.

25. The tape recording itself has not surfaced. The transcript is a typed carbon copy the heading of which indicates that it is a "recorded visit" between Kumpe and Eisner which occurred between 1:00 P.M. and 3:00 P.M. on November 12, 1963.

26. Although Walker made a suppression argument in his first habeas petition, this particular claim has not previously been raised or considered. Therefore, under *Sanders v. United States,* full consideration of the merits of the claim can be avoided only if there has been an abuse of the writ. 373 U.S. at 17, 83 S.Ct. at 1078. In the present case, Walker has not deliberately withheld this ground for relief, nor was his failure to raise it sooner due to any lack of diligence on his part. Rather, the cause for Walker's delay in presenting this claim rested on the State's failure to disclose. Under the circum-

**1. Authenticity of the Transcript.**

As a threshold matter, we must consider whether the transcript has been sufficiently authenticated to be admitted into evidence. The district court rejected Walker's efforts at authentication, and found the transcript to be inadmissible hearsay. We disagree.

Rule 901(a) of the Arkansas Rules of Evidence provides: "[T]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ark.Stat.Ann. § 28-1001, Rule 901(a) (Repl.1979). The nature of the document itself and the location in which it was found, together with Kumpe's own testimony, establish adequate authentication to render the transcript admissible.

Paul McDonald, now Chief Firearms Examiner for the Arkansas State Crime Laboratory, and formerly head of the Criminal Investigation Division of the Arkansas State Police, had possession of the transcript. McDonald testified as a ballistics expert at both of Walker's trials and at Walker's 1967 habeas proceeding. At the October hearing, McDonald testified that the State prosecutor, Wilbur C. Bentley, contacted him in February or March of 1984, and asked him to search his files for any information about the Walker case. [T. 444.] While looking for the Walker-Karam tape, McDonald found the Kumpe-Eisner transcript in a box of files that had formerly been in a locked cabinet.[27] [T. 447.] McDonald stated that he did not know where the document came from or how long it had been in his files. [T. 455.] Yet his testimony suggests that the transcript probably came into his possession through a "liaison man" stationed by the Arkansas State Police at the Penitentiary where Mildred Eisner visited Kumpe. Such liaison men passed along information about criminals and criminal activities to interested departments or state criminal in-

stances, Walker has not waived his right to a federal hearing on the claim. The district court has, in fact, already received and considered evidence on this issue, and the memorandum opinion discusses the merits of this suppression claim at some length. 598 F.Supp. at 1430-33.

Although we review this as essentially a new claim by a state prisoner, no exhaustion problem exists. While the exhaustion rule generally is to be strictly enforced, it is not jurisdictional. *See Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). The State has not argued that failure to exhaust is a problem, so that point may be deemed waived. *See Pickens v. Lockhart,* 714 F.2d 1455, 1464 n. 9 (8th Cir.1983). In any event, even if an exhaustion problem existed, the Kumpe-Eisner transcript could still be considered as weighing into the balance under the ends of justice standard.

27. The State has offered no reasonable explanation for how this document could exist and be in McDonald's files if it were not what it purports to be. At oral argument, the following colloquy took place between Judge Arnold and the Assistant Attorney General for the State of Arkansas:

JUDGE ARNOLD: Let's assume that Captain McDonald * * * doesn't know where it came from. Where could it have come from?
MR. HOLDER: I don't know.
JUDGE ARNOLD: I mean it's just not the sort of thing that happens without some color of authenticity to it.
MR. HOLDER: Captain McDonald testified that he had a file drawer, cabinet or whatever that he just put things in, and he has been putting things in it since 1940 or something. The state police are more or less in an advisory position, as you know, Judge Arnold, and the State of Arkansas, on most things, on many things, unless they are specifically asked to investigate, and I am sure he's just filed all kinds of things in there. He probably couldn't tell you where a lot of it came from.
JUDGE ARNOLD: * * * [W]hat I am trying to sort out, I am trying to hypothesize in my own mind some way this document could exist and not be authentic. Who would have made up a thing like this?
MR. HOLDER: Some supporter of the petitioner, I would think.
JUDGE ARNOLD: And put it in Captain McDonald's file?
MR. HOLDER: Could have sent it to him in the mail, Judge Arnold, one of them made up something I said. * * * I am speculating, and I am also speculating that one could probably heat up some paper like that and make it look a lot older than it is.

Transcript of oral argument at 25-27, No. 81-1700, *Walker v. Lockhart* (January 17, 1985). The State provides us with an incredible explanation.

vestigators. [T. 435–36.] Although the transcript was the first taped conversation McDonald ever recalled receiving from a liaison man, he recognized that the document originated at the Penitentiary. [T. 495–96.]

In any case, Kumpe's own testimony, viewed objectively, served to authenticate the transcript. He testified that he had several conversations at the Penitentiary with his sister during which the two discussed a number of topics contained in the document. [T. 67–72; 126–27.] Kumpe did not deny making the statement "you understand that I did shoot at that policeman," although he could not recall his exact wording. [T. 73, 77.] After looking over a copy of the document, Kumpe said, "I don't recall whether or not I said everything in here. But since it's in the document or it's in the transcript, I will say that I probably said it then, and if I did, I was pressuring my sister to take what I would call a little more expedient action." [28] [T. 75.]

Thus, besides confirming that the transcript reflected the general nature of his conversation with Eisner, Kumpe as much as admitted making the statement that he shot at Vaughan. In addition to the content of the document, the apparent age of the paper, its date, and the location in which it was found tend to support its genuineness. Under these circumstances, we conclude that the evidence overwhelmingly supports a finding that the document is authentic, and that the district court's finding to the contrary is clearly erroneous.

Although the transcript is hearsay, it would be admissible for impeachment purposes on the same basis as Kumpe's diary entry. In addition, it may also be admissible as substantive evidence under Rule 803(16) of the Arkansas Rules of Evidence, which creates an exception to the hearsay rule for a "[s]tatement in a document in existence twenty [20] years or more the authenticity of which is established."

**2. Violation of Walker's Due Process Rights By Suppression of Evidence.**

Walker argues that the State, in failing to disclose the transcript, violated his due process rights by suppressing exculpatory material. In order to establish a due process violation, Walker must show: (1) that the evidence was indeed suppressed, (2) that it was favorable to Walker, and (3) that it was material. *See Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706 (1972). *See also Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). It is irrelevant whether the State acted in good faith or bad faith in failing to disclose the evidence; negligent suppression may be sufficient. *See id.* at 87, 83 S.Ct. at 1196. The prosecutor, however, undertakes no obligation to provide defense counsel with unlimited discovery. The prosecutor violates his constitutional duty of disclosure only if "his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). In cases such as this where the defendant has made general requests for all exculpatory material, the conviction will be set aside only if "the omitted evidence creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2402. The undisclosed material must therefore be evaluated in the context of the entire record. "[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 113, 96 S.Ct. at 2402.

**a. Suppression of the Transcript.**

At the evidentiary hearing, a great deal of testimony was directed toward the ques-

28. Kumpe further explained that if he made the statement to his sister, he lied to her "to pressure her into acting with a little more haste." [T. 74.] He wanted to encourage her to "get on" his attorney to "get the appeal effected and try to have bond set." [T. 73.] It is unclear, however, why Kumpe thought his sister would expedite his release if he indicated that he was guilty of unsuspected wrongdoing.

tion of when the transcript came into Paul McDonald's possession. In a videotaped interview with reporters several days before the hearing,[29] McDonald stated that he received the Kumpe-Eisner transcript while he was the head of the Criminal Investigation Division of the Arkansas State Police, a position he held from 1960 to 1965. [T. 427.] In addition to conceding that the document had been "around since 1963," he engaged in the following interchange with the reporters:

REPORTER: You found this report only recently?

McDONALD: Not recently.

REPORTER: Well, here's what I want to know: Why—this is dated 1963—that's twenty-one years ago. Why is this just now being turned over to any attorney's—defense attorneys, prosecuting or anyone.

McDONALD: I don't know.

REPORTER: But you knew about this in 1963.

McDONALD: In 1963, I did.

REPORTER: You knew that Russell Kumpe said he fired a shot at the policeman?

McDONALD: I did.

REPORTER: This wasn't considered crucial enough to turn over, Mr. McDonald?

McDONALD: I don't know. That came from the Penitentiary.

[Pl.Exh. 12 at 1.] McDonald added that when he received the transcript, he reviewed it before placing it in his files. He explained that he did not turn the document over to anyone because he assumed "it was common knowledge," and that he had received a copy only for his information. *Id.* at 2.

At the evidentiary hearing several days later, McDonald told a different story. He testified that he had no knowledge of the transcript at the time of Walker's trials or his first habeas hearing. [T. 479.] He recalled seeing the transcript before locating it for Bentley in 1984, but he could not remember when. [T. 460, 491.] Although he was uncertain when he received the document, he believed that it had been within the past ten years (that is, since 1974). [T. 484–86.] Yet he could not explain how a document dated 1963 would suddenly show up in his files ten years later. [T. 484–85.]

The district court assumed, without explicitly deciding, that the Kumpe-Eisner transcript was in McDonald's possession at the time of Walker's conviction, and that the prosecution had a duty to disclose the statement to the defense. 598 F.Supp. at 1432. We believe that any findings to the contrary would be clearly erroneous. Police are treated as an arm of the prosecution for *Brady* purposes, "and the taint on the trial is no less if they, rather than the state's attorney, were guilty of the nondisclosure. * * * The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused." *Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842, 846 (4th Cir.1964).

Although not all police knowledge should be imputed to the prosecution, on the record before us it is reasonable to charge the State with suppression of the Kumpe-Eisner transcript. The evidence indicates that the State Police possessed the document before Walker's second trial in 1965. The record discloses that McDonald was aware of its contents because he admits having read the document when he received it. Moreover, having testified as a ballistics expert at both of Walker's trials and at the first habeas hearing, McDonald was very familiar with the facts of the case. Even though he was not involved in the general investigation of the crime, he knew that only one of the weapons recovered at the scene had been fired. Thus, the

29. The videotape and a transcript of the videotape were part of the record at the remand hearing.

significance of Kumpe's statement that he shot at a policeman that night should not have been lost on McDonald. Indeed, even if McDonald overlooked the significance of the statement, or incorrectly assumed that the prosecution was aware of the document, the State's constitutional obligation is not measured by McDonald's willfulness or negligence, but by the character of the undisclosed evidence.[30] *Agurs,* 427 U.S. at 110, 96 S.Ct. at 2400. In this instance, the suppressed Kumpe-Eisner transcript is both favorable to Walker and material on the question of Walker's guilt. *See ante* part II(B)(2)(b).

**b. Materiality of the Undisclosed Evidence.**

The district court noted that, "on the whole the transcript is not helpful to Walker. While Kumpe allegedly said he shot at 'the policeman,' it is not clear which policeman he was talking about—Barentine or Vaughan. Later in the transcript Kumpe makes statements that strongly suggest Vaughan died as a result of the shoot-out with Walker." 598 F.Supp. at 1428. The court concluded that, in the context of the entire record, "the Kumpe-Eisner statement does not create a reasonable doubt concerning the guilt of the petitioner in the shooting death of Officer Vaughan." *Id.* at 1433. In short, the district court determined that even if the transcript had been improperly suppressed, it was not material and, therefore, no due process violation had occurred. We disagree.

As this court has discussed in prior opinions, the evidence used to convict Walker was close. Therefore, "additional evidence of relatively minor importance might be enough to create a reasonable doubt." *Agurs,* 427 U.S. at 113, 96 S.Ct. at 2402. A statement by Kumpe indicating that he shot at a policeman is of more than minor importance, particularly in view of other newly discovered evidence suggesting that the murder weapon was in Kumpe's possession, and that he "fired too high."

The district court emphasized that it was not clear from Kumpe's statement whether he fired at Barentine or Vaughan. Because Kumpe added "he will go crazy trying to figure out what happened to that gun," the reference appears to be to someone who is still living, that is, Barentine rather than Vaughan. However, evidence that Kumpe fired a gun at *anyone* is exculpatory because only one of the recovered weapons (apart from the policemen's weapons) had been fired. Thus, Kumpe's admission that he "did shoot at that policeman" in effect takes the alleged murder weapon out of Walker's hand.[31]

In addition to the passage quoted above, the transcript includes the following exchange:

> EISNER: I heard from everybody that you gave them no trouble.
>
> KUMPE: I didn't until he shot me. You don't know what happened over there. I do. The policeman committed suicide, he shot Walker first. See if he don't shoot Walker then we don't have all the trouble and he is still alive. What would you do if someone shot you first?

30. In any event, the district court ordered the State to turn over *all* material held on James Dean Walker prior to the 1967 habeas hearing and McDonald apparently was aware of that court order. [T. 532–34.] McDonald turned over neither the Kumpe-Eisner transcript nor the Walker-Karam transcript, both of which were in his possession at that time.

31. The dissent asserts that this constitutes an "extraordinary finding" by this court. *Post,* at 964. To the contrary, we have made no finding on this matter, but have merely reflected on the entire record in this case, including the record before the court in prior proceedings which has been extensively discussed in the prior *Walker* opinions. No evidence exists anywhere in the complete record of the Walker proceedings that places the alleged murder weapon in Walker's hands or directly ties Walker to possession of the alleged murder weapon found on the ground at the murder scene. As we have observed, Walker held an undischarged gun in his hand.

If Kumpe did fire the alleged murder weapon found at the scene, that fact would dispel any possible inference that Walker held that gun at the time of the murder.

[Pl.Exh. 2 at 7.] The district court inferred from this exchange that Kumpe was suggesting that Walker shot Vaughan because Vaughan shot him first. Therefore, according to the district court, the transcript as a whole was not helpful to Walker. Yet Kumpe's statement could also be interpreted as indicating that he (Kumpe) did not give the police "trouble" (that is, get involved in the shooting) until after Barentine shot him. "What would you do if someone shot you first?" applies to Kumpe's situation as well as Walker's.

Indeed, that interpretation is consistent not only with Kumpe's earlier statement that he "shot at that policeman," but also with Kumpe's diary entry stating that he "fired too high." Furthermore, that interpretation tends to corroborate Alderman's testimony at the first habeas hearing suggesting that Kumpe fired a gun while under the Oldsmobile. *See Walker v. Lockhart,* 726 F.2d at 1258. In fact, the Kumpe-Eisner transcript not only lends credibility to Alderman's account of events exonerating Walker, it lends credence to the theory that the prosecution suppressed Alderman's testimony. *See id.* If, at the time of the original habeas proceeding, the district court had known about the suppression of the transcript, as well as about the other new evidence that has surfaced, it might have made a substantial difference in that court's factual analysis.

In sum, the Kumpe-Eisner transcript constitutes powerful corroboration of newly discovered evidence favorable to Walker which we asked the district court to consider on remand. Although the transcript may be weighed into the balance under the ends of justice standard, it also provides an independent basis for setting aside Walker's conviction. We conclude that the transcript itself, when considered in the context of the entire record, is sufficient to create a reasonable doubt about Walker's guilt. Suppression of the document therefore constituted a violation of Walker's due process rights.

## III. CONCLUSION.

After careful review of the record, we conclude that the newly discovered evidence sufficiently tips the balance of the ends of justice standard to permit this court to reconsider Walker's habeas petition, specifically his claim concerning the bias of the state trial judge. Although none of the evidence presented at the remand hearing relates to the state trial judge's actions, the evidence casts sufficient doubt on the factual basis for Walker's conviction to justify reexamination of our prior legal conclusions. We now hold that the trial judge's bias deprived Walker of a fair trial. Walker is therefore entitled to habeas corpus relief. The suppressed Kumpe-Eisner transcript, although relevant to the ends of justice inquiry, provides an independent basis for granting Walker's petition for relief.

The dissent asserts that the court is granting the writ on the basis of newly discovered evidence. That is not the case. We quite agree with the dissent that a claim of newly discovered evidence relevant only to guilt is not a ground for habeas relief. The federal habeas power goes only to the constitutionality of detention, not to the question of guilt or innocence. In this case, Walker's detention is unconstitutional not because new questions have been raised about guilt or innocence, but because the judge who tried his case was prejudiced against him. The newly discovered evidence is relevant only because it casts sufficient doubt on the factual basis for the conviction to justify reexamination of a legal ground (bias of the trial judge) previously rejected by this court.

The dissent further suggests that the court has summarily concluded that bias supports granting the writ without any analysis or review of prior decisions reaching a different conclusion on this issue. Again, that is not the case. In the previous en banc opinion of this court, four dissenting judges and Judge Arnold in his concurring opinion considered the merits of the bias issue and concluded that Walker did not receive a fair trial before an impartial

judge. *See* 726 F.2d at 1249 (Arnold, J., concurring), and 1258–60 (Bright, J., dissenting, joined by Lay, C.J., Heaney and McMillian, J.J.). The newly surfaced evidence gives us the power, in order to attain the ends of justice, to reach the bias question. The state trial judge's statements about Walker's forthcoming trial stand undisputed, particularly the judge's statement that he "intended to burn the S.O.B. [Walker] anyway." In no way can that statement be squared with the requirement that a defendant be tried before a fair tribunal. We need not repeat all of this court's prior discussions on this point. Given the undisputed expression of prejudice by the state trial judge (Judge Kirby), the previous legal conclusion, which we readopt, that Walker was tried before a prejudiced judge impels us to grant the writ.[32]

In his concurrence to this court's en banc decision, Judge Arnold emphasized that, although justice to the petitioner is crucial in our system, we must consider as well the State's right to fairness, and the effect on the State of granting this writ. 726 F.2d at 1250. We agree. We note, however, that at the remand hearing, the Attorney General of Arkansas remarked that the State had come before the district court "seeking to do justice," and that if the court recommended a new trial, the State wins because justice has been done. [T. 13.] We are convinced on the record before us that Walker's trial and conviction before an admittedly prejudiced trial judge constituted a gross miscarriage of justice. Retrial of Walker after more than two decades might present some difficulties for the State, but none that would seriously prejudice the prosecution. Many of the State's witnesses are still available, notably Barentine and McDonald—and now Kumpe as well. Testimony of witnesses no longer available has been preserved on the record and presumably could be offered in record form as it was for witnesses said to be unavailable at the time of Walker's second trial. Surely here, where justice has been so long delayed, the equities weigh heavily in favor of correcting this stain on our criminal justice system.

Accordingly, we conclude that James Dean Walker is entitled to habeas corpus relief. We direct the district court to grant the writ unless the State of Arkansas commences proceedings to retry Walker within ninety days from May 17, 1985, the date of this opinion.

LET OUR MANDATE ISSUE FORTHWITH.

ARNOLD, Circuit Judge, concurring.

Some of the arguments made in the dissenting opinion deserve, in my view, a brief comment.

1. The statement is made that "[t]he Court today frees James Dean Walker ...." *Post*, at 962. That is not at all what the Court is doing. We are simply holding that fundamental fairness, embodied in the Due Process Clause of the Fourteenth Amendment, requires a new trial. If Walker is ultimately freed, it will only be because he is acquitted by a jury, assuming that the state does not drop the matter on its own motion, which seems most unlikely.

2. I yield to no one in my conviction that the clearly-erroneous rule of Fed.R. Civ.P. 52 is central to the legitimate exercise of appellate power. The dissent charges that the Court is ignoring findings of fact by the District Court. Again, I must disagree. As our opinion recalling the mandate clearly stated, the District Court's duty was not to make its own findings of fact, using its own assessment of credibility, as in the ordinary case, but to make the lesser, threshold judgment whether the new evidence was sufficiently credible to deserve the attention of a jury. Except with respect to the Kumpe-Eisner conversation, we are not rejecting the District Court's findings of fact in the usual sense. Having read every page of the most recent transcript, as well as the earli-

32. We fail to see how our drawing this obvious conclusion, which we decide as a matter of law, in any way constitutes an abuse of authority or power as the dissent contends. *Post*, at 967.

er ones, I have no hesitation in joining the Court's opinion today.

3. The dissenting opinion quotes my statement in an earlier concurrence, *Walker v. Lockhart,* 726 F.2d 1238, 1250 (8th Cir.1984) (concurring opinion), to the effect that the bias on the part of the trial judge had not been shown to have done Walker any actual harm that would not have occurred if the case had been tried by another judge. That statement, of course, was made at a time when no newly discovered evidence was in the case. As I also stated in that concurrence, I believe this Court erred in 1969 when it initially rejected the claim of bias. This belief is based not on any assessment of actual prejudice, but rather on the view that everyone, whatever the evidence against him, is entitled to be tried before an impartial judge. Such a trial Walker has never had, and the newly discovered evidence that has now come into the case gives us the power, in order to attain the ends of justice, to reach and decide the bias question anew.

4. Our holding today benefits not only James Dean Walker. It benefits also all the people of Arkansas, who have a vital interest in the honor and fairness of their own courts. Walker, like anyone else accused of crime, should have a fair trial before an impartial judge. Unless and until he receives such a trial, he should not be deprived of his liberty.

With these additional comments, I join the Court's opinion in its entirety.

JOHN R. GIBSON, Circuit Judge, dissenting, joined by ROSS, FAGG, and BOWMAN, Circuit Judges.

The court today frees James Dean Walker essentially on the basis of newly discovered evidence that would have value only to impeach Russell Kumpe. Yet Kumpe was not called to testify by either side at Walker's trials even though his whereabouts and availability were known. In reaching its conclusions, the court ignores the district court's finding of fact that the new evidence is not sufficiently credible to deserve the attention of a jury. Rather, viewing the evidence in a light most favorable to Walker, the court engages in wholesale fact-finding on grounds never asserted in his habeas corpus petitions.

I.

First, the court errs in relying on new evidence to set Walker free.[1] The Supreme Court held in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), that a claim of newly discovered evidence relevant only to guilt is generally not a ground for habeas relief. To justify granting the writ, "such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Id.* at 317, 83 S.Ct. at 759. No argument is made that the evidence discussed by the court bears upon the constitutionality of Walker's detention. It plainly has to do with only his guilt. This court applied the rule from *Townsend* in *Drake v. Wyrick,* 640 F.2d 912 (8th Cir.1981). In *Drake,* the petitioner's newly discovered evidence consisted of a prior inconsistent statement by one of the prosecution's witnesses. The court held that such evidence did not bear upon the constitutionality of the petitioner's detention and denied relief under *Townsend. Id.* at 913. Drake's argument for habeas relief presented even a better claim than Walker does because the evidence there allegedly impeached a witness who actually testified at trial. Here, however, the evidence relates only to the statements of a person who did not testify at Walker's trials. Even if we assume that Kumpe's tes-

1. Granting "the great writ of liberty," *Burns v. Wilson,* 346 U.S. 137, 148, 73 S.Ct. 1045, 1052, 97 L.Ed. 1508 (1953) (separate opinion of Frankfurter, J.); *Darr v. Burford,* 339 U.S. 200, 225, 70 S.Ct. 587, 600, 94 L.Ed. 761 (1950) (Frankfurter, J., dissenting), is equivalent to freeing the petitioner. *See Lefkowitz v. Newsome,* 420 U.S. 283, 303, 95 S.Ct. 886, 896, 43 L.Ed.2d 196 (1975) (Powell, J., dissenting). While the court's order is conditional, it effectively frees Walker unless the state obtains a third conviction.

timony is credible and would be admissible in Arkansas state court,[2] it does not provide a basis for habeas relief. As the Eleventh Circuit recently held, "newly discovered evidence in the form of a confession by another does not render the conviction void and subject to collateral attack by habeas corpus because it goes to the merits of the conviction, not its legality." *Drake v. Francis,* 727 F.2d 990, 994 (11th Cir. 1984) (quoting *Shaver v. Ellis,* 255 F.2d 509, 511 (5th Cir.1958)). Thus, the new evidence does not provide grounds for habeas relief under *Townsend.*

## II.

Second, the court ignores the findings of the district court regarding *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). After discussing the "ends of justice" test, Justice Brennan stated in *Sanders:*

> The principles governing * * * justifications for denial of a hearing on a successive application are addressed to the sound discretion of the federal *trial* judges. Theirs is the major responsibility for the just and sound administration of the federal collateral remedies, and theirs must be the judgment as to whether a second or successive application shall be denied without consideration of the merits.

*Id.* at 18, 83 S.Ct. at 1079 (emphasis added). In 1981, Judge Woods found that the ends of justice would not be served by reconsidering Walker's judicial bias claim. *Walker v. Lockhart,* 514 F.Supp. 1347, 1353 (E.D. Ark.1981). In 1984, after considering the new evidence, Judge Woods again concluded that reconsideration would not further justice:

> I have been directed to determine whether the new evidence, when considered against the background of the existing record, sufficiently tips the balance of the "ends of justice" standard to require that a new trial be held. My answer to this question is strongly in the negative. I believe that the evidence in the hearing before me taken as a whole confirms Walker's guilt in accordance with the two decisions of the Supreme Court of Arkansas on appeal from jury verdicts of guilt.

*Walker v. Lockhart,* 598 F.Supp. 1410, 1434 (E.D.Ark.1984). This court directed the district court to make these findings. With only the briefest discussion, it finds that the district court abused its discretion in reaching its conclusions, which are essentially factual.

## III.

The foundation for granting the writ is newly discovered evidence: the Kumpe diary and the transcript of a conversation between Kumpe and his sister, Eisner. The only evidentiary value that either of these documents would have would be to impeach Kumpe's testimony.

Little is to be gained at this late date from a detailed analysis of the voluminous record in this case. Suffice it to say that on the subject of Kumpe's alleged statements to his then wife, the district court found as follows:

> [T]here is little or no credible testimony that Kumpe fired a gun on the night in question. * * * Kumpe's wife came closest to such testimony, but her testimony deserves a great deal of skepticism. She obviously has much animosity toward Kumpe. She admitted shooting Kumpe on one occasion, and Kumpe claimed she tried to kill him on another occasion. Her animosity toward Kumpe is mixed with sympathy and admiration for Walker.

2. The court observes that "[i]t may be that" Kumpe's diary and other statements "would not be admissible as substantive evidence at a new trial." *Supra* at 951. The district court held as a matter of local law that the new evidence could be used only for impeachment. 598 F.Supp. at 1433. This conclusion should not be lightly disregarded. *Cf. Kansas State Bank v. Citizens Bank,* 737 F.2d 1490, 1496 (8th Cir.1984) (district court's conclusions of local law entitled to substantial deference). If, however, the evidence is admissible for substantive purposes, *Townsend* is still controlling, for the new evidence does not have constitutional implications.

598 F.Supp. at 1427–28. As to the diary entry, the district court found:

> If Kumpe wrote this entry exactly as intended and if it reflects the truth, this is the only admissible evidence where Kumpe said he fired a shot on the night in question. Not a single eyewitness has testified that Kumpe fired a shot. In fact, the overwhelming proof is that Kumpe was being searched when the shoot-out between Walker and Vaughan ensued.

*Id.* at 1428. Regarding the pistol Kumpe claims to have secreted, the district court concluded:

> I find no such credible evidence in this record [that Kumpe shot Vaughan]. I further find no credible evidence in this record that Kumpe shot *at* Vaughan. I find very little evidence worthy of belief that Kumpe fired any shot on the night in question. Kumpe has denied under oath that he did so. The only evidence to the contrary appears in a very strange and ambiguous statement in a diary being kept by Kumpe, which has been discussed in detail.

*Id.* at 1430.

Contrary to these findings, the court today decides that "the diary provides admissible evidence that Kumpe said he fired a shot on the night in question," *supra* at 951, and that in the Eisner-Kumpe transcript "Kumpe as much as admitted making the statement that he shot at Vaughan." *Id.* at 957. From this interpretation flows the extraordinary finding that the "alleged murder weapon [was] out of Walker's hand." *Id.* at 959. The court concludes:

> After carefully reviewing all of the evidence presented at the hearing, we conclude that a significant portion of that evidence bears on the question of Walker's guilt or innocence, that it would be admissible if a new trial were held, and that it is credible enough to be heard by a jury. * * * Of particular importance is Kumpe's admission that he owned the gun identified as the murder weapon, and the evidence that Kumpe fired a gun on the night in question, as indicated by the testimony of his former wife, and his own diary entry of January 16, 1968.

*Id.* at 954–955.

Actions under 28 U.S.C. § 2254 (1982) are civil suits, in which the findings of the district court may be reversed only if clearly erroneous. *See Wade v. Mayo,* 334 U.S. 672, 683–84, 68 S.Ct. 1270, 1275–76, 92 L.Ed. 1647 (1948). The conclusions above are reached by the court without determining that the district court was clearly erroneous in reaching its findings.[3] The court flatly disregards Judge Woods' finding that no credible evidence indicated that Kumpe shot at Vaughan and that little credible proof showed that Kumpe fired any shot. 598 F.Supp. at 1430. The court's action flies in the face of principles that recently have been clarified by the Supreme Court. In *Anderson v. City of Bessemer City,* — U.S. —, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), the Court explained:

> [The clearly erroneous] standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court. 'In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*' If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's

3. The court explicitly finds the district court clearly erroneous in only two respects, the authenticity of the Eisner-Kumpe transcript and the minimum credibility threshold. *See supra* at 949 n. 7, 957.

choice between them cannot be clearly erroneous. * * *

This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.

*Id.* at ——, 105 S.Ct. at 1511–12 (citations omitted). In ignoring the findings of the district court and reaching its own factual conclusions, the court blatantly disregards holdings of the Supreme Court.

The court today announces a new test: whether newly discovered evidence is sufficiently credible to deserve the attention of the jury. It relies on no authority for this standard, which seems to be created by the court precisely for this case. As far as I can discover it has no basis in the Constitution, statutes, or opinions of the courts. Whether or not this is a newly minted lower threshold, its essence is a determination of the credibility of evidence, which is singularly the province of the district courts. Without detailed discussion, the court today holds that the district court was clearly erroneous in its finding on this issue.[4] The court concludes that the district court went beyond this limited assignment and "seems instead to have made his own assessment of the credibility of the evidence." The court draws too fine a distinction. Judge Woods has made a determination of credibility and it has not been shown to be clearly erroneous.

## IV.

The most troublesome question is whether there was suppression of the Kumpe-Eisner transcript so as to entitle Walker to relief under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The issue is whether the "omitted evidence creates a reasonable doubt that did not otherwise exist." *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). There are at least two reasons why the transcript is not grounds for relief under *Brady.* First, it has never been properly authenticated. The district court made the following factual findings concerning the transcript: "It is not authenticated. McDonald testified that it was sent to the State Police by parties unknown sometime in the last ten years. He does not know who took it or how it was taken. * * * [N]o one has attested to its authenticity." 598 F.Supp. at 1430–31. The court today, however, finds this conclu-

4. Any evidence that is relevant and material may be credible enough to be heard by a jury. *See* Fed.R.Evid. 402. Nevertheless, it does not follow that the discovery of such credible evidence is grounds for a new trial after a jury has returned its verdict, *cf. United States v. Agurs,* 427 U.S. 97, 111 & n. 19, 96 S.Ct. 2392, 2401 & n. 19, 49 L.Ed.2d 342 (1976) (under Fed.R.Crim.P. 33, newly discovered evidence is not grounds for a new trial unless it "probably would have resulted in acquittal"), or during habeas proceedings. The court would distinguish this case, however, as involving *Sanders* rather than Rule 33. Such a distinction is unwarranted, as illustrated in *Jones v. United States,* 279 F.2d 433 (4th Cir.1960). In *Jones,* two prisoners moved for a new trial on the grounds of newly discovered evidence. The evidence consisted of a confession by a third party that he and an accomplice had committed the crimes for which the defendants had been convicted. The district court denied relief, and the court of appeals affirmed:

> Where there is a grave question of the credibility of the after-discovered evidence, * * * the role of the trial judge is that of the fact-finder, so much so that the Supreme Court has said an appeal from his resolution of the facts should be dismissed as frivolous. The rule has been applied where, as here, a third party confession is the after-discovered evidence upon which the motion for new trial is founded.
>
> This remedial procedure, a motion for new trial based upon after-discovered evidence, is designed to serve the ends of justice. * * * That purpose would hardly be served if the law required the trial judge, who heard all the evidence and saw all of the witnesses, to assume that a jury would believe testimonial evidence however improbable and unworthy of belief he finds it to be. If the purpose of the remedy is to be served, without subjecting it to undue abuse, the trial judge who approaches the question of the probable effect of the new evidence upon the result, in the event of a new trial, should be vested with broad discretion in considering matters of credibility as well as of materiality.

*Id.* at 436 (footnotes omitted). This reasoning and the absence of legal support for the court's conclusion here strongly suggest that Judge Woods' findings should not be overturned.

sion clearly erroneous and reasons that "Kumpe's own testimony, viewed objectively, served to authenticate the transcript." *Supra* at 957. It underscores Kumpe's statement that "since it's in the document or transcript, I will say that I probably said it then and if I did, I was pressuring my sister to take a little more expedient action." *Id.* Nevertheless, the district court interpreted the testimony this way:

> Kumpe was shown a document purported to be a transcript of a conversation with his sister. Kumpe would not admit to having made the statements contained therein. (T. 76.) He was asked about a statement, 'You understand that I did shoot at that policeman.' (T. 73.) Kumpe said that if he made such a statement, he lied 'to pressure her into acting with a little more haste.' (T. 74.) In answer to a question from the court, Kumpe stated that he could not say that he had the conversation set forth in the transcript. He testified that from time to time, when his sister was visiting, he did discuss certain items related in the transcript. (T. 127).

598 F.Supp. at 1420–21. Kumpe testified in person before the district court. When the court today concludes that his testimony establishes the authenticity of a transcript, the critical parts of which he has testified were lies, if said at all, it is engaging in a credibility determination, thereby reaching conclusions directly contrary to the district court's. Thus, the court again disregards the dictates of *Bessemer City,* in which the Supreme Court stated:

> When findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. * * * Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. * * * But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

— U.S. at —, 105 S.Ct. at 1512–13 (citations omitted).[5]

Second, the transcript is not material when considered in light of the whole record. The district court found that "the Kumpe-Eisner statement was surreptitiously acquired and not under oath. The only sworn statement given by Kumpe disavows any participation in the actual shooting of Officer Vaughan." 598 F.Supp. at 1433. The district court also correctly observed that suppressed evidence is less likely to be material if it relates only to impeachment. *See Lindhorst v. United States,* 658 F.2d 598, 606 (8th Cir.1981), *cert. denied,* 454 U.S. 1153, 102 S.Ct. 1024, 71 L.Ed.2d 309 (1982); *United States v. Librach,* 520 F.2d 550, 554 n. 3 (8th Cir.1975); *Link v. United States,* 352 F.2d 207, 212 (8th Cir.1965), *cert. denied,* 383 U.S. 915, 86 S.Ct. 906, 15 L.Ed.2d 669 (1966).[6] It concluded that in

5. The court also relies on the Kumpe-Eisner transcript in concluding that the new evidence satisfies the "ends of justice" test. To the extent that the transcript is not authenticated, however, it cannot support relief under that ground either.

6. The Supreme Court has never held whether *Brady* and *Agurs* apply to evidence admissible only for impeachment purposes. Several courts have decided that these cases do so apply but only upon a more substantial showing of materiality. *See United States v. Oxman,* 740 F.2d 1298, 1321 (3d Cir.1984) (Sloviter, J., dissenting). Apparently, however, no court has held that impeachment evidence is material under *Brady* when the witness allegedly impeached did not testify. Kumpe was certainly known to be a direct eyewitness and his whereabouts were known during both the first and the second trials. He was called to testify in neither. The court indeed weaves a gossamer web to grant the writ on the basis of newly discovered impeachment testimony of a witness who could have been called to testify in the trial but was not.

the context of the entire record, the "Kumpe-Eisner statement does not create a reasonable doubt concerning" Walker's guilt. 598 F.Supp. at 1433. This conclusion may be set aside only if it is clearly erroneous. *See United States ex rel. Moore v. Brierton*, 560 F.2d 288, 292 (7th Cir.1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1285, 55 L.Ed.2d 794 (1978). The court today concedes that the transcript is susceptible of different interpretations, not all of which are favorable to Walker. The district court's choice of the views unfavorable to Walker is not clearly erroneous. *See Bessemer City*, — U.S. at —, 105 S.Ct. at 1511. Thus, the suppression claim must fail on materiality grounds.

## V.

The court's exercise in reviewing the newly discovered evidence issue is merely a springboard to justify a reconsideration of the judicial bias claim.[7] The court concludes that newly discovered evidence justifies reconsideration of the bias issue, then immediately determines that the question has been decided by the dissent in the earlier en banc opinion, which found bias in the trial court's denying Walker a recess to locate witnesses and its rejection of a ballistics report. *Supra* at 960–961. In reality, the court is reaching this conclusion independent of any findings by a district court.

In the first habeas proceeding Judge Henley rejected Walker's argument of judicial bias and this finding was unanimously affirmed on appeal. In the second habeas proceeding, Judge Woods refused to consider the claim because he found that *Sanders* had not been satisfied. Following the recall, Judge Woods did not consider the merits of the bias argument because the new evidence did not concern the issue. Thus, the only district court findings relating to bias in this extensive history are adverse to Walker. Moreover, in an earlier opinion, Judge Arnold wrote that while he believed there was bias on the part of the trial judge, he was not persuaded that it "did Walker any actual harm that would not have occurred if the case had been tried by another judge." *Walker v. Lockhart*, 726 F.2d 1238, 1250 (8th Cir.1984) (Arnold, J., concurring). He specifically concluded that the denial of the recess was not crucial and that the ruling on the ballistics report was not to be faulted.

Now the court summarily concludes that bias supports granting the writ. Even without the opinions in the first round of habeas proceedings, the court would be arrogating the role of the district court by making initial factual findings on appeal. *See Anderson v. Fuller*, 455 U.S. 1028, 1030, 102 S.Ct. 1734, 1735, 72 L.Ed.2d 150 (1982) (Burger, C.J., dissenting). But this zealousness is rendered doubly improper because the court contradicts the earlier district court finding and our prior approval of that finding without any effort to analyze or review these decisions. The court thus seriously abuses its authority in deciding the bias issue.

## VI.

The history of the Walker habeas efforts demonstrates the eagerness of the court to find its own facts and to free Walker. The first habeas proceedings, the earlier decision of this court en banc, and the opinion today reflect Walker's shifting factual claims. From the speculative reexamination of the facts engaged in by the dissent in this court's earlier en banc consideration, the court today proceeds to discard the district court's carefully reached findings and to take the most appealing path of finding its own facts. It has no power to do so. The application for a writ of habeas corpus should be denied.

7. The purpose of recalling the mandate and remanding the case to the district court was to consider the impact of new evidence. Based on this new evidence, the court now holds that the trial judge's bias deprived Walker of a fair trial. This conclusion does not follow because, as the court concedes, none of the evidence presented at the remand hearing related to the bias claim. *Supra* at 960.